12857

SMITH v. TODD

(152 S. E., 506)

June, 1929.

*Messrs. S. M. Wolfe,* and *J. H. Marion,* for appellant,

*Messrs. Watkins & Prince,* for respondent,

March 15, 1930.

The opinion of the Court was delivered by Mr. Justice Stabler.

From the admitted facts, it appears that Floyd L. Shaw and Rosa Belle Shaw, husband and wife, resided in the County of Anderson, in this State. In December, 1928, Shaw shot and killed his wife and immediately thereafter committed suicide. At the time of her death, Mrs. Shaw had a policy of insurance covering her life, with her husband named therein as beneficiary. The insurance company paid the proceeds of the policy, the sum of $4,000, into the hands of the defendant, as administratrix of the personal estate of Floyd Shaw, and this action is brought by the plaintiff, as administrator of the estate of Rosa Belle Shaw, to recover, in view of the circumstances of her death, the amount of the insurance from the estate of her deceased husband.

The plaintiff attempts to plead two causes of action. The first is predicated upon the applicability of an Act of the Legislature passed in 1924 (33 St. at Large, 1188), which provides that " * * * no person who shall be convicted in any Court of competent jurisdiction of unlawfully killing another person shall receive any benefit from the death of the person unlawfully killed, except in cases of involuntary manslaughter, whether by way of intestate succession, will, vested or contingent remainder or insurance or otherwise. * * * That the interest which would devolve upon the person excluded from receiving any benefit by the terms of this Act, shall vest in and become the property of the estate of the person unlawfully killed. * * * *"

After pleading the manner in which Shaw and his wife were killed, and that the defendant as administratrix holds the proceeds of the insurance policy as a part of the personal estate of Floyd L. Shaw, the plaintiff, in his first cause of action, alleges:

"That * * * the verdict of the Coroner's Court accordingly was that the said Rosa Belle Shaw came to her death on the said 8th day of December, 1928, by gunshot

wounds at the hands of the said Floyd L. Shaw, and that he did there and then, feloniously kill her, against the peace and dignity of the State.

"That the said Floyd L. Shaw, died intestate and without children, who would or could inherit from said deceased intestate.

"That by virtue of the facts as alleged herein, under the Statute in such cases provided, to which reference is craved and the provisions of which are hereby invoked, said insurance in the amount of four thousand dollars, under the policy on the life of the said Rosa Belle Shaw, reverted to the estate of his victim, the said Rosa Belle Shaw, and the said Floyd L. Shaw, having murdered her and having been so convicted, neither he nor his estate can profit by said killing."

The second cause of action is predicated upon the theory that, in the absence of statute or clear implication conferring such right, the benficiary under a life insurance policy cannot, under applicable principles of the common law, acquire and perfect title to the proceeds of such policy by murdering the insured.

In this cause of action, the plaintiff pleads that Shaw "unlawfully and feloniously" shot and killed his wife and then immediately committed suicide by shooting himself, and that the defendant, as the personal representative of the estate of Shaw, holds the proceeds of insurance as a part of Shaw's personal estate, and further alleges:

"That the said contract of insurance insofar as it applied to the beneficiary, the said Floyd L. Shaw, was rendered nugatory and in derogation of public policy.

"That as the result of said beneficiary murdering the said Rosa Belle Shaw, his wife, the insured, in the circumstances, his estate is denied that right to benefit therefrom and the said insurance, the proceeds of the said policy carried on the life of the said Rosa Belle Shaw, at her death, inured to the personal estate of the said Rosa Belle Shaw for and in behalf

of her heirs-at-law, the plaintiff herein, her father, and her brother and sisters surviving."

The defendant demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action, alleging with particularity numerous reasons therefor. The matter was heard by his Honor, Judge Bonham, who, by an order dated June 6, 1929, sustained the demurrer and dismissed the complaint. From this order the plaintiff appeals.

The first question presented for our consideration is whether the allegations of the first cause of action bring it within the terms of the Act of 1924, so as to entitle the plaintiff to recover thereunder.

As already pointed out, it is alleged, and for the purposes of the demurrer, the allegations are taken to be true, that Shaw killed his wife, and that the Coroner's Court investigated the case and found by its verdict that he "feloniously" killed her. The statute provides, as stated, "that no person who shall be convicted in any Court of competent jurisdiction of unlawfully killing another person shall receive any benefit from the death of the person unlawfully killed." The contention of the appellant is that the act of Shaw, in committing suicide immediately after slaying his wife, did not relieve him from the consequences of taking the life of the insured; and that the Coroner's Court being the only Court having jurisdiction of Shaw's dead body, the verdict of the jury of that Court fulfilled the requirements of the statute as to a conviction.

With regard to this contention, the Circuit Judge has this to say in his order:

"The word 'conviction' has phases of meaning dependent upon the connection in which it is used. Argument upon a given proposition may carry 'conviction' to the mind of the person to whom it is addressed; may convince him; but it does not 'convict' him of any offense. It seems inescapable from the context of the Act of 1924 that the General As-

sembly used the words 'convicted by a Court of competent jurisdiction' to mean that a person should be convicted after a trial in a Court in which he has had the opportunity to meet and cross examine the witnesses against him, to offer evidence in his own behalf, and to be represented by counsel, and to be tried by a jury of his peers, consisting of twelve jurors. A coroner's jury consists of six persons, the proceedings are wholly *ex parte*. Rarely is a suspected person represented at an inquest by counsel. He cannot introduce witnesses in his own behalf.

" 'Conviction, in its legal sense, means a final judgment conclusively establishing guilt.' (13 Corpus Juris, 907, § 4.)

" 'Conviction in its legal sense, is the determination of guilt in a criminal prosecution.' 1 Words and Phrases, Second Series, page 1045.

" 'A man is convicted when he is found guilty, or confesses the crime before judgment had.' *Shepherd v. People,* 25 N. Y., 406.

" 'The term "conviction" ordinarily signifies a finding of a jury by verdict that the person is guilty; or a plea of guilty by defendant, constitutes a conviction of him.' *People v. Fabian,* 126 App. Div., 89, 111 N. Y. S., 140, 146.

" 'The word "conviction" ordinarily signifies the finding of a jury by a verdict that the person is guilty.' *Judge v. Powers,* 156 Iowa, 251, 136 N. W., 315, 316, Ann. Cas., 1915-B, 280.

"I find in 2 Words & Phrases, Third Series, page 506, reference to a Kansas case (*Hogg v. Whitham,* 120 Kan., 341, 242 P., 1021) which apparently refers to a statute similar to ours. I have not access to the case. The citation in Words & Phrases is to this effect: 'Under a statute prohibiting any person convicted of killing another from inheriting from the person so killed, etc., it was held that a coroner's jury's findings of when and by what means death was caused did not satisfy the status.' This would seem to be the rational conclusion."

The citation of additional authorities is unnecessary. We are satisfied, from a careful study of the statute as a whole, that the Circuit Judge was correct in his conclusions, and that it was not the intention of the Legislature to include the verdict of a corner's jury as fulfilling the requirements of the Act as to a conviction. Hence, the allegations of the complaint do not bring the first cause of action attempted to be pleaded within the terms of the Act relied upon; and upon this ground alone we affirm the order of the Circuit Judge sustaining the demurrer to this cause of action.

The second question raised by the appeal is whether the plaintiff can recover under any recognized rule of public policy in this State. The answer to this question will determine the sufficiency of the second cause of action. We have given the matter careful study and investigation, and agree with the position taken by the appellant; and, in the preparation of this opinion as to this phase of the case, have drawn largely upon the well-prepared argument of his counsel.

The issue here may be measurably clarified by stating it in this form: Prior to the enactment of the Statute of 1924, above referred to, would a beneficiary who had murdered the insured acquire a valid title to the proceeds of the policy? To this question the law, as interpreted by the Courts, uniformly gives a negative answer.

The general rule is thus stated in 37 C. J., 576:

"Where the assignee or beneficiary intentionally and feloniously causes the death of insured, there can be no recovery on the policy in favor of such wrongdoer or his assignee, unless the case falls within the operation of an incontestable clause."

The point seems to have been first ruled on by the Supreme Court of the United States in *Mutual Life Insurance Company v. Armstrong,* 117 U. S., 591, 6 S. Ct., 877, 881. 29 L. Ed., 997, 1000, wherein that Court held:

"But, independently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired."

In the case of *Anderson v. Life Insurance Co. of Va.*, 152 N. C., 1, 67 S. E., 53, where the insured had been murdered by the beneficiary and the beneficiary, as here, had died by his own hand, the North Carolina Court thus states the law:

"It is a principle very generally accepted that a beneficiary who has caused or procured the death of the insured under circumstances amounting to a felony will be allowed no recovery on the policy. Vance on Insurance, 392, 393; Cooley's Insurance Briefs, 3153; 25 Cyc., 153; 3 A. & E. (2d Ed.), 1021. This wholesome doctrine, referred by most of the cases to the maxim '*Nullus commodum capere potest de injuria sua propria,*'· has been uniformly upheld, so far as we are aware, except in certain cases where the interest involved was conferred by statute, and the statute itself does not recognize any exception. Such an instance has occurred in our own Court, in the case of *Owens v. Owens,* 100 N. C., 240, 6 S. E., 794, where a widow, convicted as accessory before the fact to her husband's murder, was awarded dower under the statute, a decision which caused an immediate amendment of the statute (Pub. Laws 1889, c. 499), and this amendment has since prevailed as the law of the State on that subject. The authorities are also to the effect that in cases like the present, where the contract is made between the insured and the company for another's benefit—that is, a valid contract of that character—a felony of the kind indicated on the part of the beneficiary will not relieve the com-

pany of all liability on the policy, but recovery can be had usually by the representative of the insured, and for the benefit of the latter's estate."

In the case of *Johnston v. Metropolitan Life Ins. Co.*, 85 W. Va., 70, 100 S. E., 865, 866, 7 A. L. R., 823, where the beneficiary had murdered the insured and assigned the policy, the West Virginia Court states the law as follows:

"That Susie Pickens, the beneficiary, has no right to recover upon this policy of insurance can scarcely be doubted. The liability of the company became fixed by the death of the insured, and this was brought about by the felonious act of the beneficiary. It would be monstrous for the Courts to lend their aid to any one for the purpose of enriching himself by the commission of murder, and to entertain suit on behalf of the beneficiary to recover upon this policy of insurance would be doing that very thing. It is against the policy of our law to reward one for the commission of crime, and whenever the effect of the enforcement of a right which one would otherwise have would be to give him an advantage by reason of his felonious act, the Court will decline to entertain it. This is well established by the authorities. *New York Mutual Life Insurance Co. v. Armstrong*, 117 U. S., 591, 6 S. Ct., 877, 29 L. Ed., 997; Cooley's Briefs on the Law of Insurance, 3153; 14 R. C. L., 1228, title Insurance, § 409, and authorities there cited. Nor can the assignees of the beneficiary stand on any higher ground than the beneficiary herself. At the time she made the assignment to them she had nothing to transfer. She had voluntarily placed herself in a status which disqualified her to be beneficiary under the policy. Consequently the assignment to Daugherty and Shields was ineffectual to transfer any interest in the fund."

In the comparatively recent case (1923) of *Slocum v. Metropolitan Life Ins. Co.*, 245 Mass., 565, 139 N. E., 816, 27 A. L. R., 1517, an action against the insurance company by the administrator of the insured who had been shot and killed by Charles Miller, her husband, who at that

time was the beneficiary named in the policy, the Massachusetts Court states the rule and cites the authorities as follows:

"Admittedly Charles Miller would be debarred from acquiring the proceeds if he should bring an action in his own name, under G. L., c. 175, § 125. It would be contrary to public policy to permit a beneficiary who has feloniously taken the life of the insured to recover on the policy. *Mutual Life Ins. Co. v. 'Armstrong,* 117 U. S., 591, 29 L. Ed., 997, 6 S. Ct., 877; *Metropolitan Life Ins. Co. v. Shane,* 98 Ark., 132, 135 S. W., 836; *Supreme Lodge, K. & L. H. v. Menkhausen,* 209 Ill., 277, 65 L. R. A., 508, 101 Am. St. Rep., 239, 70 N. E., 567; *Schmidt v. Northern Life Association,* 112 Iowa, 41, 51 L. R. A., 141, 84 Am. St. Rep., 323, 83 N. W., 800; *Anderson v. Life Ins. Co.,* 152 N. C., 1, 67 S. E., 53; *Filmore v. Metropolitan Life Ins. Co.,* 82 Ohio St., 208, 28 L. R. A. (N. S.), 675, 137 Am. St. Rep., 778, 92 N. E., 26; *Equitable Life Assur. Soc. v. Weightman,* 61 Okl., 106, L. R. A., 1917-B, 1210, 160 P., 629; *Murchison v. Murchison* (Tex. Civ. App.), 203 S. W., 423; *Johnston v. Metropolitan Life Ins. Co.,* 85 W. Va., 70, 7 A. L. R., 823, 100 S. E., 865; *Cleaver v. Mutual Reserve Fund Life Association* (1892), 1 Q. B., 147 [61 L. J. Q. B. N. S., 128, 66 L. T. N. S., 220, 40 Week. Rep., 230, 56 J. P., 180 —C. A.]; 3 L. R. A. (N. S.), 727, note."

However, we think that the legal conclusion—that a beneficiary who murders the insured is not entitled to take under the policy—is not necessarily dependent for its validity upon a bald judicial declaration of "public policy." A decision predicated upon the ground of "public policy" proceeds upon the assumption that there are no definite established principles of the substantive law which govern the particular case, and that, in the absence of such applicable rules and principles, the Court is justified in determining the issue presented in accordance with what it deems to be for the public interest as a matter of governmental policy. In the case of *Box v. Lanier,* 112 Tenn., 393, 79 S. W., 1042, 1045, 64

L. R. A., 458, 464, involving a question identical in principle with that before us, the Court said:

"It has been well said that there are certain general and fundamental maxims of the common law which control laws as well as contracts. Among these are: 'No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. * * *' These maxims embodied in the common law, and constituting an essential part of its warp and woof, are found announced both in textbooks and in reported cases. Without their recognition and enforcement by the Courts, their judgments would excite the indignation of all right-thinking people. The first of these maxims is applied in order to prevent one from taking the benefit of his own fraud. Why should not the last be enforced so as to forbid a party receiving the fruits of his own crime?"

A review of the decisions for the purpose of showing the wide variety of cases in which these fundamental principles have been expressly or impliedly recognized and applied in actions arising both in contract and in tort, is not here necessary. But, by way of illustration of the applicability of the maxim, that "no person shall be allowed to reap the benefit of his own wrong," to the question before us, the case of *Taff v. Smith,* 114 S. C., 312, 103 S. E., 551, is in point. In that case, the beneficiary named in the policy had wrongfully prevented the insured from changing the beneficiary by refusing to deliver up the policy to have the change made in accordance with the terms of the policy. The Court expressly invoked this maxim and held that although there had been no legal change of the beneficiary, such beneficiary was precluded by her wrongful conduct from recovering. If the legal right of a beneficiary acquired by the commission of a wrong of that comparatively venial character cannot be recognized and enforced, manifestly a beneficiary whose title has been acquired or perfected by the murder of the insured

could thereby acquire no right or title to the proceeds of the policy enforceable in the Courts of this State.

That such conclusion follows from the application of the pertinent principles of law and equity above adverted to, and does not involve the doctrine of "public policy" in the sense in which that doctrine was invoked by the insurance company in the case of *Weeks v. N. Y. Life Ins. Co.*, 128 S. C., 223, 122 S. E., 586, 590, 35 A. L. R., 1482, relied on by the Circuit Judge, would seem too clear for question. In the *Weeks case,* where the policy was matured by the death of the insured by legal execution for crime, the insurer's defense to a suit on the policy was, in substance, that to permit a recovery upon a contract so matured would tend to encourage crime and for that reason would be against public policy. In an elaborate opinion, this Court correctly held that the position taken by the insurer was untenable. In that opinion, the principle that "no person shall be allowed to` reap the benefits of his own wrongful acts" was incidentally referred to, and its application to the facts of that case denied. That conclusion was unquestionably sound. There the policy, payable to the estate of the insured, represented a vested property right of the insured and was a vested part of his estate, which could not be divested without contravening the constitutional provision against the forfeiture of estates for crime. By the commission of the crime for which he was executed, the insured neither acquired nor perfected any property right in the policy that could inure to the benefit of himself or his estate which he did not already have. What the insured reaped from the commission of his crime was involuntary death by legal execution. To hold that in reaping death he also thereby reaped a benefit by maturing his life insurance policy, would be to give to the maxim, that one shall not derive a benefit from his own wrong, an ultramundane scope wholly beyond its legal signification, since, as was said in the *Weeks case,* payment of the policy could "bring no profit to, and confer no earthly benefit upon, the dead man who com-

mitted the crime." But in the case at bar, under the admitted fact that the right of the insured to change the beneficiary was reserved by the policy, the beneficiary, through whom the defendant claims, had no vested property right in the policy prior to the death of the insured. His interest was a mere expectancy. *Antley v. Insurance Co.,* 139 S. C., 23, 137 S. E., 199, 60 A. L. R., 184. The beneficiary's title to the proceeds of the policy, and his right to recover thereunder, if any, sprang directly out of his crime—the murder of the insured. The fact that the beneficiary committed suicide after the murder is wholly immaterial in this aspect of the matter. Unless he took or acquired the right to the proceeds of the policy by surviving the insured, it is plain that he could transmit by his death no right or title therein to his personal representative. But if he lived to acquire title to the proceeds of the policy as a result of the death feloniously caused by him, it is equally obvious that he lived to reap the benefit of his wrong in contemplation of law regardless of how long he thereafter lived. That the question involved in the *Weeks case* is essentially different from that here presented, and that neither the conclusion reached nor the reasoning employed in that case can soundly be invoked to support the view that a beneficiary who murders the insured is entitled to take under the policy, we think, is sufficiently apparent.

In the light of authority and upon principle there can be no doubt, therefore, that under the law of this State, considered apart from the statute, the beneficiary of a life insurance policy whose interest in the policy is a mere expectancy, and who murders the insured, takes no title to the proceeds of the policy and is barred from a recovery thereupon. Such was the law at the date of the enactment of the Statute of March 26, 1924, and such was the law at the time of the commencement of this action, unless abrogated or so changed by that statute as to permit such a beneficiary to recover under the facts alleged in the complaint. The question which remains for determination, there-

fore, is whether the statute of 1924, properly construed and interpreted, abrogated or changed the common-law rule in its application to the facts of this case.

If the purpose, scope, and effect of this Act were wholly comprehended in the title—"An Act to Prohibit Persons Unlawfully Killing Other Persons from Benefiting by Reason of Their Unlawful Act"—it is apparent that, insofar as its effect upon the case now before us is concerned, it would be merely declaratory of the common law and would expressly prohibit the beneficiary of a life insurance policy who unlawfully kills the insured from recovering upon the policy. But, in the body of the Act, the prohibition against benefit from the unlawful killing of another is confined to persons *who shall be convicted in any Court of competent jurisdiction of unlawfully killing another person.*" The inquiry before us resolves itself, therefore, into the question whether this restriction as to the operative force and effect of the Act is to be construed as an abrogation of the common law and the substitution therefor of the statute as the only law upon the subject.

The rule of construction is thus stated in 25 R. C. L., 1054:

"It is not to be presumed that the legislature intended to abrogate or modify a rule of the common law by the enactment of a statute upon the same subject; it is rather to be presumed that no change in the common law was intended, unless the language employed clearly indicates such an intention. It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. In order to hold that a statute has abrogated common law rights existing at the date of its enactment, it must clearly appear that they are so repugnant to the Act, or the part thereof

invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory."

See, also, *Real Estate Company v. Exchange Assurance,* 132 S. C., 427, 128 S. E., 865.

Applying that principle of construction here, we think the statute is readily and soundly susceptible of the construction that it was the legislative intent, not to abrogate or delimit the common-law rule barring a beneficiary who murders the insured from taking under the policy, but to add to and extend that rule in an important particular not covered by the common law. By its express terms, as we have seen, the statute is limited in operative effect to a person "who shall be convicted in any Court of competent jurisdiction of unlawfully killing another person," and its plain primary purpose is to make the fact of such conviction sufficient of itself to establish the legal status of a person so convicted with respect to receiving "any benefit from the death of the person unlawfully killed." There can be no doubt that the statute goes no further than to make such conviction, in and of itself, *determinative of the status of the person convicted with respect to benefits receivable from the death of the person unlawfully killed.*

That, prior to the enactment of this statute, the conviction of a person in the criminal Courts of unlawfully killing another did not establish and fix his status in that regard with respect to the vesting, enforcement, and transmission of civil rights derived from and based upon the death of the person unlawfully killed by him, is well settled.

See 15 R. C. L., 1000; *Frierson v. Jenkins,* 72 S. C., 341, 51 S. E., 862, 110 Am. St. Rep., 608, 5 Ann. Cas., 77; *Fonville v. Ry. Co.,* 93 S. C., 287, 75 S. E., 172.

Hence, although under the general or common law applicable, as we have seen, a person who had unlawfully caused the death of another was not entitled to "receive any benefit" from such death and thus to reap profit from his own wrong or crime; *he was not prohibited from receiving such benefits as a person "convicted in a Court of com-*

*petent jurisdiction of unlawfully killing another person."*
His civil status with respect to property rights predicated
upon•the death of the person unlawfully killed by him re-
mained unaffected by the judgment of his conviction in the
criminal Courts, and for the purpose of asserting and en-
forcing such rights he, or anyone claiming under him, was
at liberty to have the issue, as to whether he had wrongfully
or feloniously caused the death of the other person, tried and
adjudicated in a civil action in a different tribunal governed
by different rules of evidence, practice, and procedure. By
expressly embracing within the prohibition of the law the
person so "convicted," it would seem entirely clear that the
statute neither expressly nor impliedly abrogated the com-
mon-law rule, but merely extended or supplemented it by
making the conviction in the criminal Courts a conclusive
judicial determination of the convict's status with respect
to "receiving any benefit from the death of the person un-
lawfully killed," invokable and entitled to full faith and
credit as such conclusive determination in any controversy,
action, or suit involving the succession to or devolution of
the estate of the person unlawfully killed.

The only plausible argument, perhaps, for the contention
that this statute by implication abrogated the common-law
rule and conferred upon a person who had unlawfully killed
another the absolute right to succeed to, enforce, and enjoy
property rights devolved by the death of the person slain,
unless he should be convicted of his crime in the criminal
Courts, would seem to rest upon the consideration that in
the criminal Courts guilt must be proved beyond a reasonable
doubt while in a civil action the issue is determinable by a
preponderance of the evidence. The argument is that, since
the degree of proof required in a criminal Court is higher,
a legislative intent to make a conviction in that forum the
sole test of the slayer's status as a person prohibited to profit
by his victim's death, must be implied. That argument in-
volves the assumption that the legislative purpose was to
soften and relax the law in favor of the slayer. Interpreted

in consonance with the settled rules of construction applicable, there is no basis, as we have seen, for that assumption. But, if there were, it is to be observed that the statute so construed would still cut both ways. While protecting the slayer's rights until so convicted, in the view suggested, nevertheless by force of such conviction under the statute those rights would be, as they were not formerly, finally and irrevocably barred by the conviction. If he should be unjustly convicted, neither he nor his privies would have the right under the statute, which they had under the law as it was, to have that issue tried and determined upon its merits in another tribunal. Certainly, the diversity in the degree of proof required in the different Courts would seem to afford no sound basis of fact upon which to predicate a legislative intention to abrogate or change *by implication* the common-law rule that one who unlawfully causes the death of another shall reap no benefit from his own wrong.

It follows, we think, that this statute may not correctly be construed to abrogate the common law, which, in its application to the facts of this case, would prevent the beneficiary, Floyd L. Shaw, who unlawfully and feloniously killed the insured (as alleged), from taking a valid title to the proceeds of the policy. If the beneficiary took no valid title under the policy, his administratrix could take none; the insurance fund is unlawfully held by the defendant, the title to the proceeds of the policy vests in the insured's estate, and the administrator of such estate has the right to recover and distribute the proceeds. 14 R. C. L., 1228, and cases cited.

For the foregoing reasons, the Circuit Judge was in error in sustaining the demurrer to the second cause of action.

The judgment of this Court is that the order of the Circuit Judge insofar as it sustains the demurrer to the first cause of action, is affirmed; and that his order insofar as it sustains the demurrer to the second cause of action, is re-

versed, and the case remanded to the Circuit Court for trial as to that cause of action.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN, BLEASE and CARTER concur.