16951

HENRY LEGGETTE, JR., by g/a/l and WORTHIE NEWELL, Adm'r, Respondents, v. EARL R. SMITH, Appellant

(85 S. E. (2d) 576)

404

J. Malcolm McLendon, Esq., of Marion, *for Appellant,*

406

 

*James B. Dixon, Esq.,* of Marion, *for Respondents,* 

January 12, 1955.

LEGGE, Justice.

On May 9, 1951, Edna N. Smith was shot and killed by her husband, Earl L. Smith. This action was brought by Henry Legette, Jr., her son by a former marriage, and Worthie Newell, as administrator of her estate, the complaint alleging that the homicide was unlawful, wrongful, intentional, felonious and malicious; that she had died intestate, survived by her said son and her said husband; that in consequence of the unlawful homicide, whether murder or voluntary manslaughter, her husband was debarred of inheritance from her, and therefore all of her estate, after payment of debts and proper charges against the same, became the property of her said son; and praying for a declaratory judgment to that effect. Earl L. Smith answered, denying that he had unlawfully killed his wife, claiming his right to inherit as one of her heirs, and praying for a declaratory judgment in his favor and that all issues of fact in the case be determined by trial by jury. He also moved for dismissal of the complaint upon the ground that he had been tried in the Court of General Sessions for Marion

County for the alleged unlawful homicide, and had been acquitted thereof, and that under the provisions of Section 19-5 of the 1952 Code of Laws only one who has been convicted of unlawfully killing another is barred from inheritance from the person so killed. The motion was refused under authority of *Smith v. Todd,* 155 S. C. 323, 152 S. E. 506, 70 A. L. R. 1529, and *Keels v. Atlantic Coast Line R. Co.,* 159 S. C. 520, 157 S. E. 834. The case was tried at the May, 1953, term of the Court of Common Pleas for Marion County, before the Honorable G. Badger Baker, Presiding Judge, and a jury. At the close of the testimony, the presiding judge, having refused to direct a verdict for the plaintiffs, submitted the case to the jury, which found for the defendant. Thereafter he granted plaintiffs' motion for judgment *non obstante veredicto,* holding that the only reasonable inference from all the evidence was that the defendant had unlawfully killed his wife and that he was therefore barred of inheritance from her.

The trial judge properly refused appellant's motion to dismiss the complaint, and the exceptions in that regard are overruled. Section 19-5 of the 1952 Code provides that "No person who shall be convicted in any court of competent jurisdiction of unlawfully killing another person shall receive any benefit from the death of the person unlawfully killed, except in cases of involuntary manslaughter, whether by way of intestate succession, will, vested or contingent remainder, insurance or otherwise. * * *" In *Smith v. Todd, supra,* where it was alleged that the husband had feloniously shot and killed his wife and then immediately committed suicide by shooting himself, this court, on appeal from an order sustaining a demurrer to the complaint, held that the statute did not abrogate the common law rule barring a beneficiary under a policy of life insurance who had unlawfully and feloniously killed the insured from taking thereunder, and that it merely extended and supplemented the common law rule by making the fact of such conviction sufficient of itself to establish the legal

status of the person so convicted with respect of receiving "any benefit from the death of the person unlawfully killed". This construction of the statute was confirmed in *Keels v. Atlantic Coast Line R. Co., supra* [159 S. C. 520, 157 S. E. 835], where it was held that the fact that a wife who had killed her husband had been convicted of involuntary manslaughter did not conclusively establish her right to the proceeds of an employees' relief fund to which he had contributed and of which she had been designated beneficiary, and that the judgment roll showing her conviction was inadmissible in evidence. To quote from the opinion in that case:

"Under the common-law rule, with regard to such benefits, a beneficiary who may have been convicted of murder or voluntary manslaughter is not bound by his conviction, but the question of his guilt or innocence, when involved in a civil action to which the rule is applicable, still remains to be determined in the trial of such civil action; under the provisions of the statute, the conviction, itself, in a court of competent jurisdiction, of murder or voluntary manslaughter, is the determining factor in a civil action to which the statute is applicable, the necessity of establishing guilt in such civil action by evidence dehors the record of conviction being thus obviated. Further than this the statute does not go. Neither expressly, nor by implication, does it permit one who has been acquitted in a court of competent jurisdiction, on a charge of unlawful killing, to show such acquittal in the trial of a civil case in which his guilt or innocence may be a question at issue; in like manner, it does not allow one who on such charge has been convicted of involuntary manslaughter only to show that fact in such a civil trial—in other words, in these respects it confers no privilege which did not obtain under the common law."

The statute has no application in the present case, appellant having been acquitted.

There is no substantial dispute as to the physical facts. Appellant and his wife, Edna, and the respondent Henry

Legette, Jr., her son by a former marriage, lived at the home of her father, a mile and a half west of the town of Marion. She operated an establishement nearby known as Edna's Place, where groceries, cigarettes, candy and liquor were sold. Appellant, who suspected one Julian Graham of being too intimate with her, had about two weeks before the fatal shooting found Graham in a cafe in Marion, called him outside, and told him to stay away from Edna's Place. Appellant testified: "I told him to stay away from out there, that he had a good wife and to leave my wife alone". On the night of May 9, 1951, about 11:30 o'clock, appellant, suspecting that Graham was there, entered Edna's Place through a bedroom window at the rear, and, walking through the hall into the front room, saw Graham there and immediately opened fire with a six-shooter, which he emptied. According to appellant's testimony: "Whenever I came down the hall, he (Graham) was sitting on the counter, and Edna was standing between his legs". According to Graham's testimony he was sitting on the counter with a man named Shelley, and Mrs. Smith was "somewhere near the front door, near the middle of the room". To quote further from appellant's testimony:

"Q. Were you shooting at Mr. Graham? A. Yes, sir.

\* \* \*

"Q. Were you shooting at Mrs. Smith that night? A. No, I was shooting at Graham.

\* \* \*

"Q. You didn't care whether you hit her or not? A. I don't know what happened after I started shooting.

"Q. If she was in your line of fire, you had to shoot her if you shot him? A. I meant to kill Graham.

"Q. Did you mean to kill her? A. No, sir.

\* \* \*

"Q. You do admit you meant to kill Graham? A. I did."

Graham testified that he didn't see Smith until after the first shot had been fired; that that shot had struck him, and

he then saw Smith in the room, near the rear wall; and further:

"Q. After this shot was fired, did you notice the deceased, Mrs. Smith, do anything? A. She ran from where she was near that front door, she ran towards Mr. Smith.

"Q. Did you hear her make any statement to him? A. I don't recall the exact statement. She said: 'Stop! Stop! Don't Shoot!' "

Graham, badly wounded in several places, ran out of the house, followed by Smith, who continued to attack him after he had fallen to the ground. Edna Smith, in addition to receiving a wound on each hand, was struck on the right side by a bullet which passed through both lungs, causing her death.

The trial judge set aside the verdict in favor of appellant and decreed that he be debarred from inheriting from his wife not because he had actually intended to kill her, but because the evidence warranted no reasonable inference other than that her death had been occasioned in the course of his commission of an unlawful act, namely his attempt to kill Graham, which was without legal justification or excuse. Fully agreeing with the trial judge that the evidence showed conclusively that appellant was engaged in the commission of an unlawful act and that the death of his wife so occasioned would have warranted his conviction of murder or voluntary manslaughter on the criminal side of the court, we are not in agreement with his conclusion that this fact alone requires that appellant be debarred of inheritance from his wife.

In the annotation following the report of *Smith v. Todd, supra,* in 70 A. L. R. at pages 1539 *et seq.,* will be found an exhaustive review of the American and English decisions dealing with the issue of forfeiture of the rights of a beneficiary under a policy of life insurance by reason of his having feloniously killed the insured. See also the annotation on this subject in 91 A. L. R. 1486. And in the annotation

in 139 A. L. R. at pages 501 *et seq.* the issue of forfeiture of a murderer's inheritance from the person whom he has slain is fully explored. Among the decisions there mentioned is *Price v. Hitaffer,* 164 Md. 505, 165 A. 470, where it was held that neither the husband nor his next of kin, where the former had murdered his wife and then committed suicide, could share in her estate under a statute of distribution not expressly excluding a husband from inheriting from the wife whom he had murdered. In that case it was stated that, the case being one of first impression, the court was at liberty to adopt either of the two existing views, the one which it adopted being that the old universally recognized principles of justice and morality whereby no one shall profit by his own wrong, found any claim upon his own iniquity, or acquire property by his own crime, must control the interpretation of statutes of descent and distribution having no express provisions to the contrary; the other and opposing view, while recognizing such principles, holding that the enactment by the legislature of the statutes of descent and distribution was a legislative declaration of the public policy of the state overriding the contrary public policy long embodied in the common law, and that courts are powerless to read such principles into the unambiguous words of the statute without infringing the domain of legislative action, even though such interpretation result in sanctioning the enrichment of the perpetrator of the most heinous crime of murder from the estate of his victim.

It is to be noted that the status of a killer in respect of insurance of which he is the named beneficiary, on the life of the person killed, is somewhat different from that in respect of inheritance. The conflict as to insurance is between the principles of justice and morality embodied in the common law maxim before mentioned, and a contract right; in respect of inheritance, the common law principles come into conflict with the statute law. So far as the latter conflict is concerned, the instant case is one of

first impression in this state; but the reasoning of the court in *Smith v. Todd* and *Keels v. Atlantic Coast Line R. Co., supra,* as well as considerations of fundamental justice and morality, impel us to hold that where one intentionally and unlawfully kills another he shall not be permitted to inherit from the person so killed. Nor are we deterred from so holding because of Article 1, Section 8, of the Constitution of South Carolina, which declares that "no conviction shall work corruption of blood or forfeiture of estate". To hold as we do takes from the felonious slayer no property; it simply forbids his acquisition of property by his crime. *Riggs v. Palmer,* 115 N. Y. 506, 22 N. E. 188, 5 L. R. A. 340; *In re Tyler's Estate,* 140 Wash. 679, 250 P. 456, 51 A. L. R. 1088.

But we know of no decision in the courts of America or England denying to one who in the course of an unlawful assault upon one person kills another to whom he bears no malice and to whom his criminal intent is not directed, the right to inherit from the person so killed. Nor do the principles of the common law or considerations of justice, morality or public policy so require. In the criminal law, where the issue is between the accused and the State, it is well enough to consider malice as following the bullet and thus constructively directed toward a person for whom it was not in fact intended, for the offense is against the peace and dignity of the State. But to invoke this fiction of the criminal law against the right of inheritance in a civil case is, it seems to us, extending the common law principle to encompass a factual situation that was never intended to be within its purview. The commission of a crime does not in itself work a forfeiture of the criminal's right to inherit. A. may murder B., a stranger, without impairment of A.'s right to inherit from A.'s father. Let us suppose that in the present case Edna Smith's son, Henry, had become involved in a quarrel with a stranger outside of the store, and had fired his pistol at the stranger under such circumstances that, had the stranger been killed, Henry

would have been guilty of voluntary manslaughter, but that the bullet had missed its mark and had gone through a window and killed Henry's mother. Should he, in such a case, regardless of the fact that he had not the slightest intention of killing his mother, be held to have forfeited his rights as her heir? Or should a wife, who, while driving with her husband in the family car, was negligent or reckless in its operation and thereby caused a wreck and her husband's death, be debarred from inheriting from him or receiving the proceeds of a policy of insurance on his life, despite the total absence of any intent to harm him? We think not. *Cf. Minasian v. Aetna Life Insurance Co.,* 1936, 295 Mass. 1, 3 N. E. (2d) 17; *Metropolitan Life Insurance Co. v. McDavid,* D. C. E. D. Mich. 1941, 39 F. Supp. 228; *In re Wolf,* 1914, 88 Misc. 433, 150 N. Y. S. 738.

By several exceptions appellant contends that the verdict of the jury in his favor, being supported by sufficient evidence, was binding upon the trial judge, who therefore erred in setting it aside and decreeing judgment against him. By Exception 10 he contends that this is so because the suit was in equity and the issues were framed and submitted to the jury as issues out of equity. Exception 11 charges that the granting of judgment for the respondents was erroneous "for the reason that the pleadings and the testimony raise issues of fact which the trial judge recognized at the time of the trial and so submitted them to the jury".

The transcript of record shows that in due time appellant served upon respondents notice that he would move before the presiding judge "for an order requiring that the whole issue raised by the pleadings" be tried by a jury; that attached to the notice was the question of fact proposed for submission to the jury, to wit: "Did Earl L. Smith commit the crime either of murder or of voluntary manslaughter when he killed Edna N. Smith?"; and that upon the case coming up for trial the pleadings and the notice of motion to submit the issues to the jury, and the proposed question, were handed to the trial judge. It does not appear that the

motion to submit issues, "or the whole issue", or the proposed factual question was argued, or that it was acted upon by the trial judge. On the contrary, it appears that of his own motion he submitted all of the factual issues to the jury as in a law case. To quote briefly from his charge to the jury:

The question you have to pass on, or the decision you have to make, is whether the defendant, Earl L. Smith, shall participate, share, or inherit, as an heir at law, a portion of the estate of his deceased wife, Edna Smith. * * *

"Now, in order for you to decide whether or not he is an heir at law or will inherit a portion of her estate, as the surviving husband, it is necessary for you to answer the question: Did Earl Smith wrongfully, maliciously, feloniously and unlawfully shoot and kill his wife, the deceased, Edna N. Smith. * * *

"As you will recall, I have said several times, the ultimate question for decision is whether the defendant unlawfully killed the deceased. You can add to it, such as that he would either be guilty of murder or manslaughter. * * *

"If you find from the evidence * * * that the death of the deceased, Edna N. Smith, was due to an unlawful act or acts on the part of the defendant, whereby he would be guilty of murder or manslaughter, then your verdict would be: 'We find for the plaintiffs'; that is, that he will not inherit any of the property owned by his wife at the time of her death. If you find that the death of the deceased was not by an unlawful act, your verdict would be: 'We find for the defendant'. That would mean that he would inherit part of the estate left by Edna N. Smith at the time of her death".

And from his order on the motion for judgment notwithstanding the verdict:

"The question in this case was whether the death of the deceased was due to any unlawful act or acts of the defendant, whereby he would be guilty of murder or manslaughter. That question has no equitable characteristics, but is one in

an action at law. Contrary to the understanding of defendant, issues were not framed and submitted to the jury as is generally done in some equitable actions".

The Uniform Declaratory Judgments Act has been codified in this state as Chapter 24 of Title 10 of the 1952 Code of Laws, Sections 10-2001 through 10-2014. Section 10-2009 reads: "When a proceeding under this chapter involves the determination of an issue of fact such issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending. All existing rights to jury trials are hereby preserved."

An issue that is essentially one at law is not transformed into an equitable one by virtue of the fact that declaratory, rather than investitive, relief is sought. In *Aetna Casualty & Surety Co. v. Quarles,* 4 Cir., 92 F. (2d) 321, 325, action was under the federal act seeking a declaratory judgment to the effect that because of collusion between the defendant and his wife in an action brought in the state court by her, to recover damages for personal injuries resulting from his negligent operation of his automobile in which she was a passenger, the company was relieved of liability under its policy of insurance covering the said automobile. While the declaratory proceeding was pending, the wife recovered judgment in the state court and later sued the company in the state court to recover the amount of the judgment, and these facts were incorporated by amendment in the pleadings in the declaratory proceeding. In the course of his opinion affirming the judgment of the district court dismissing the bill, Judge Parker said:

"When the original bill was filed, the real question as to which the company sought a declaratory judgment was whether it would have a good defense under the policy to an action growing out of a judgment against the insured in the action in the state court, because of the collusive nature of that action, if judgment should be rendered against

him therein. * * * The declaratory judgment was sought under the bill as amended, therefore, merely for the purpose of determining the validity of a defense which the company was asserting in the action against it and which could be equally well determined in that action. * * * The company seems to think that by asking a declaratory judgment it became entitled to a trial in equity without a jury and that this is a sufficient reason for granting declaratory relief notwithstanding the institution of the action on the policy; but this is clearly not the case as the defense to determine which the declaratory judgment was sought was legal and not equitable in character. Where the issues raised in a proceeding for a declaratory judgment are of this nature, they must be tried at law if either party insists upon it, for the statute so provides. 28 U. S. C. A. § 400 (3). And, irrespective of this provision of the statute, it is clear that the right of jury trial in what is essentially an action at law may not be denied a litigant merely because his adversary has asked that the controversy be determined under the declaratory procedure."

To the same effect are *United States Fidelity & Guaranty Co. v. Koch,* 3 Cir., 102 F. (2d) 288, and *Pacific Indemnity Co. v. McDonald,* 9 Cir., 107 F. (2d) 446, 448, 131 A. L. R. 208. In the latter the court said:

"It follows from what we have said that we simply have a situation herein where a party who has issued a policy of insurance anticipates a suit thereon by the insured or one subrogated to his rights and to avoid delay brings the matter before the court by petition for declaratory relief. In such a proceeding, although the parties are reversed in their position before the court, that is, the defendant has become the plaintiff, and *vice versa,* the issues are ones which in the absence of the statute for declaratory relief would be tried at law by a court and jury. In such a case we hold that there is an absolute right to a jury trial unless a jury has been waived."

In the instant case, declaratory judgment was sought for the purpose of determining the validity of the claim of the respondent Henry Legette, Jr., to ownership and the right to possession of the entire net assets, real and personal, of his mother's estate, as against the anticipated claim of appellant to a portion thereof under our statute of distribution. Had appellant commenced an action against respondents for the possession of his portion of the estate, it cannot be doubted that he and they would have been entitled to a jury trial as a matter of right, the issues being essentially legal and not equitable. *Cf. Jordan v. Jordan*, 130 S. C. 330, 125 S. E. 910. Respondents cannot, by invoking the declaratory procedure and thus reversing the position of the parties, deprive him of his constitutional right. The factual issues here being legal in character, their determination by the jury was conclusive on the trial judge. It matters not that appellant's demand that they be determined by a jury was made under the mistaken belief that the action was in equity rather than at law. The trial judge properly viewed it as one at law, and so submitted the issues to the jury. That in his charge he instructed them, in effect, that forfeiture of appellant's right to inherit from his wife was not dependent upon proof of actual intent on his part to kill her, but would follow if such intent had been directed toward Graham alone, does not alter the conclusive effect of their verdict. Under correct principles of law governing the case, the verdict was not without support in the evidence; and respondents cannot complain of a charge too favorable to them.

Reversed.

STUKES, TAYLOR and OXNER, JJ., and J. FRANK EATMON, A. A. J., concur.