STATE OF WEST VIRGINIA *v.* PHOENIX MUTUAL LIFE INSURANCE COMPANY, *a corporation, et al.*

(CC 475)

Submitted September 13, 1933. Decided September 26, 1933.

110

*L. S. Trotter* and *John T. Copenhaver,* for the state.

*Brown, Jackson & Knight* and *Geo. S. Couch,* for defendant Insurance Company.

HATCHER, JUDGE:

This suit involves the right of the State of West Virginia to escheat the proceeds of an insurance policy as derelict and without a rightful owner *(bona vacantia).*

The State by T. C. Townsend, tax commissioner, filed bills (original and amended) which contain the following allegations: In April, 1926, Albert F. O'Dell secured an insurance policy on his life for the sum of $5,000 from the defendant, the Phœnix Mutual Life Insurance Company; the beneficiary in the policy was O'Dell's wife, Elsie, with the right reserved

to him to change the beneficiary; in September, 1926, (while the policy was in full force)· Mrs. O'Dell feloniously killed her husband and two days afterwards took her own life; O'Dell died intestate and M. M. Wickline was appointed his administrator; Mrs. O'Dell left a will naming B. J. Pettigrew as executor; Wickline as administrator prosecuted a suit against the insurance company to recover the proceeds of the policy but was denied recovery by this Court in *Wickline, Adm'r. v. Ins. Co.,* 106 W. Va. 424, 145 S. E. 743; O'Dell left no blood relatives, and his wife was his sole distributee; there are no unpaid creditors of his estate; the heirs of Mrs. O'Dell are not entitled to the insurance (because of her crime), the insurance company is not entitled to keep it, it is without rightful owner, and is accordingly escheated to the State.

Upon demurrers of the insurance company the circuit court sustained the bills and certified their sufficiency to this Court.

The insurance company makes the point that murder of the insured by the beneficiary is a risk impliedly excepted from the policy. As I am not in accord with my brethren on this point Judge Maxwell has very kindly furnished a statement of the position of the Court thereon, as follows:

"In a life insurance policy, the insurer insures the insured against death for the· benefit of a named beneficiary or beneficiaries or the estate of the insured. The undertaking of the insurer is against death from any cause, whether disease, accident or homicide. But there is usually a stipulation in modern policies of standard life insurance that there shall be no liability in case of suicide of the insured within a designated period, ordinarily one or two years, except, as is sometimes stipulated, the company will pay to the beneficiary a sum equal to the premiums which have been paid on the policy prior to the time of the suicide. And, on the basis of public policy the law precludes a beneficiary who has murdered the insured from receiving the benefits of the policy. Subject to these exceptions, namely, suicide of the assured within a limited time specified in the policy, and the deprivation of the right of recovery by a homicidal beneficiary, and possibly where the insured forfeits his life by law

(*Scarborough* v. *Ins. Co.*, 171 N. C. 353, 88 S. E. 482), the broad liability of the insurer stands paramount and unqualified with respect to creditors and distributees of the estate of the assured.

"If the insured is murdered by a stranger, there can be no question of the liability of the insurer, nor, in reason, can there be any less basis of liability of the insurer if the insured is murdered by the beneficiary. The thing insured against is the death of the insured without regard to the manner of his going. When the insured dies of natural causes or from violence, the thing insured against has transpired. The liability to pay the principal of the policy has thus become fixed. Public policy does not preclude recovery on a policy where the assured has been murdered by the beneficiary, save only as the beneficiary, or those claiming under him, would profit from such recovery. Subject to that exception, the 'trust fund' should stand for the benefit of those having equitable interest in the estate of the insured."

The "trust fund" doctrine was adopted by this Court in *Johnston* v. *Ins. Co.*, 85 W. Va. 70, 100 S. E. 865, 867, which is similar in all material respects to this suit. That case held that (a) public policy would not permit a beneficiary who had murdered the insured to recover the insurance; (b) the crime of the beneficiary does not extinguish the insurance fund but "a trust results in favor of the estate of the insured"; and (c) where the beneficiary is the sole distributee of the insured, his personal representative will be denied a recovery of the insurance, in order to prevent the beneficiary securing the fund by indirection under the law of descents and distributions. The trust fund doctrine under subsection (b) seems to have radiated in the states from the case of *Schmidt* v. *Life Ass'n.*, (1900) 112 Iowa 41, 83 N. W. 800. Some misgiving has arisen because of the precedents relied upon in that decision, which were the English case of *Cleaver* v. *Mutual Ass'n.*, (1891) 1 Law Rep. Q. B. Div. 147, and certain state decisions. The English decision was in conformity with the Married Woman's Property Act of 1882 which provided that a policy payable to a wife (no trustee of the fund having been appointed) should vest in the assured or his legal representatives in trust for her. The

several state decisions cited in the *Schmidt* case are based on rules of mutual benefit associations, statutes and in one case on a parol declaration of trust by the insured. Only one decision as quoted in the *Schmidt* case, to-wit, *Ryan* v. *Rothweiler,* (Ohio) 35 N. E. 679, attempted to sustain the trust fund doctrine "on principle" (not named) and that case admitted statutory influence.

It is obvious that statutes, rules of benefit associations, etc., have naught to do with a purely equitable doctrine, such as the one under consideration. It is equally obvious that in the absence of a statute this doctrine is applicable to an ordinary life insurance policy such as the O'Dell policy, for the following reasons: (a) It is true that "the purely contracted rights arising out of" a policy are ordinarily determined by its provisions. *Spicer* v. *Ins. Co.,* 268 Fed. 500, 503. But it is "a basic rule of construction" that all general legal principles affecting contracts, enter by implication into and form a part of every contract as fully as if specifically expressed therein. *Illinois, etc. Ass'n.* v. *Collins,* (Ill.) 173 N. E. 465, 467. (b) It is a fundamental rule of the common law that no man shall be permitted to profit by his own wrong. *People* v. *Schmidt,* 216 N. Y. 324, 341, 110 N. E. 945. And (c) it is a settled expedient of equity to impress a constructive trust on whoever acquires property rights by the commission of a wrong to hold the property as a trustee for the one equitably entitled thereto. Pomeroy Eq. Juris. (4th Ed.), sec. 1053. That author says: "The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto* are practically without limit." The younger Pomeroy complains that courts have ordinarily overlooked this expedient in regard to a benefit procured by a crime (murder), and says: "That the principle should be applied in this class of cases and the criminal held a constructive trustee of the fruits of his crime, seems too plain for argument." Pomeroy, *supra,* note (b) p. 2411.

The Supreme Court of North Carolina has reduced the foregoing principles to the following formula: "As a question of common law the homicide does not prevent the legal title from passing to the criminal as the heir or devisee of

his victim, but equity, acting *in personam,* compels the wrongdoer who has acquired the *res* to hold it as a constructive trustee of the person wronged or his representative, if he be dead." *Bryant* v. *Bryant,* 193 N. C. 372, 377-8, 137 S. E. 188, 191. Thus the trust fund doctrine pronounced in the Iowa case and adopted by this Court in the *Johnston* case is supported by principle as well as by precedent.

This doctrine may not be invoked in equity as a matter of course. A constructive trust, said Dean Pound, "is purely a remedial institution." See 33 Harvard Law Review 420-1. Such a trust is raised by a court of equity only to remedy the position of one having an equitable interest in the trust property. There can be no trust without a beneficial owner, i.e. without a *cestui que trust.* Commenting on such a situation Washburn on Real Property (6th Ed.), sec. 1405. says: "If there be no determinate person who has a right to claim as a beneficiary, it lacks an essential element of a trust." No *cestui que trust* claims the insurance money in this suit; therefore there is no one to be remedied. The State was a stranger to the insurance policy and has no equitable interest in the insurance money as such. "A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." *Beatty* v. *Exploration Co.,* 225 N. Y. 380, 122 N. E. 378, 381. The advantage resulting to the insurance company through retention of the insurance money is a mere incident. The material fact against the right of the State to invoke the doctrine is that the State had no equity in the insurance transaction itself and has suffered nothing from which it should be relieved. Moreover, a trust estate was not subject to escheat under the common law. Beach on Trusts, sec. 417; Perry on Trusts (6th Ed.), sec. 434; Washburn, *supra,* sec. 1442; Story Eq. Juris. (14th Ed.), sec. 1592, note 6; Pomeroy, *supra,* sec. 990. The West Virginia Code 1923, chapter 78, section 10, (changing the common law) specifies that the personal estate of a decedent shall "accrue" to the State only when "there may be no other distributees." There was another distributee in this instance—the wife of the insured. In *Wickline* v. *Ins. Co., supra,* this Court refused to bring into existence an estate which would devolve on Mrs.

O'Dell. Her status is a complete bar to the statutory right of the State.

Consequently no escheat has accrued to the State, the bills are insufficient, and the ruling of the circuit court thereon is reversed.

*Reversed.*