## STEWART v. TRAVELERS PROTECTIVE ASS'N OF AMERICA.

### No. 7863.

Circuit Court of Appeals, Fifth Circuit.

Jan. 7, 1936.

Edward A. Sibley and H. W. Green, both of San Antonio, Tex., for appellant.

Perry S. Robertson and Martin J. Arnold, both of San Antonio, Tex., and Maurice P. Phillips, of St. Louis, Mo., for appellee.

Before FOSTER and SIBLEY, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

This is an appeal from a verdict directed below in favor of the defendant. Plaintiff sued as the beneficiary of a certificate of accident insurance, issued by the defendant on the life of Walter Scott Cookenboo. All of the five assignments of error present, in one form or another, the issue of the correctness of the judge's ruling in directing a verdict for defendant.

Section 3 of article X of the constitution and by-laws of the defendant provides:

"Sec. 3. Whenever a Class A member in good standing and subject to the conditions, provisions and limitations of this Constitution, and Amendments thereto shall, through external, violent and accidental means, receive bodily injuries which shall, independently of all other causes and within six months next following the date of said accident, result in the death of said member, his beneficiary shall be entitled on account of such death and subject to the conditions, provisions and limitations of this Constitution and Amendments thereto, to receive $5,000."

We also quote section 1 of article XII, as follows:

"Section 1. This Association shall not be liable to a member, or his beneficiary, for any disability benefits, special loss benefits, or death benefits, when the disability, special loss or death of a member occurs under any of the following conditions or circumstances: When or while a member is in any degree under the influence of intoxicating liquor or liquors, or of any narcotic or narcotics; when caused wholly or in part by reason of or in consequence of the use of intoxicating liquor or liquors, or the use of any narcotic or narcotics; when caused wholly or in part by any bodily or mental infirmity or disease; * * * when resulting wholly or in part from paralysis."

In directing the verdict, the judge, among other things said:

"There is, as I said, ample evidence here to show that the death was the result of violent, external means. I am not at all impressed with the Insurance Company's defense of alcoholism. I think they have failed signally to show that. They allege here that this man's death grew out of alcoholism and drinking; I do not think the evidence supports that. I do not think you would find that, if I submitted it to you. On the question as to his disease contributing to the matter, I am inclined to think that on the facts here I would let the matter go to the jury. If he was attempting to walk around the room and because of his weakened condition, slipped or tripped or stumbled, and it was shown that he had, I do not think that ought to preclude him from recovery, despite the fact the policy contains a provision the accident must solely be the cause of the death, and must not be combined in any way with disease or paralysis or anything of the kind."

After reading the evidence, we agree with that part of his conclusions. However, he found that there was no substantial evidence to go to the jury as to how the injury occurred. The record discloses the following facts and circumstances:

Deceased was a traveling salesman, about sixty years of age and had been living at the Travelers' Hotel in San Antonio, Tex., for ten years. In May preceding his injury, which took place about January 28, 1933, he had been in a severe automobile accident, since which time he had not been able to work with any regularity or continuity. There was some evidence that he had been suffering from arteriosclerosis, but the issue was in dispute. The evidence was also conflicting as to whether there was a partial paralysis. For two days before his death, he had been confined to his room in the hotel. The hotel porter testified that on the day before the injury he carried Cookenboo's dinner to him about 12:30 p. m., at which time the latter was sitting at the writing desk, reading a newspaper. The following morning, this witness carried ice to the room between 8 and 9 o'clock, and at that time deceased was lying in bed in his pajamas reading a magazine. The housekeeper went to his room between 9 and 10 o'clock a. m. the same day and found Cookenboo bleeding; "he was in bed all full of blood; his bed-clothes and pads and pillow and his under-clothes were all full of blood, just a mass of blood * * * he was kinder sitting up in bed. * * * We put Mr. Cookenboo in a rocking-chair and then I fixed the bed and helped put him back in bed. One of the bell-boys moved the rocking-chair over and we helped him in the rocking-chair. He was too weak to get up from the bed to the rocking-chair; that was from the loss of blood I guess, because he lost lots of blood; the whole thing was a mass of blood." She did not notice the wound then, but next day, after he was dead, she saw a "place about as big as a dollar * * * right back of the ear."

Upon being asked if Cookenboo said anything about how he had been injured, objection was made by defendant that it would be hear-say. The court then directed counsel to find out "how long it was after she went there or got word to go

there." The witness testified that she was on the same floor and was called by the manager of the hotel and went immediately to the room, and although she did not know how long he had been bleeding, the blood "was all fresh." The court then held the statement of deceased was a part of the res gestæ and overruled the objection. The witness stated: "The only thing Mr. Cookenboo said at the time as to how he got his injury was, 'I fell.' Said, 'I fell' but didn't say when or anything else."

She had gone into the room the day before Cookenboo was injured to clean it and "he didn't want his bed made up because he felt so bad." The next day after he was injured, about 9 o'clock a. m., the manager sent a bell boy up to ask her if she had seen Cookenboo and the two went to his room, knocked on the door, received no answer, went in and found him dead. Cookenboo was lying on his back with his hands across his chest.

The hotel porter testified that he was sent by the hotel manager to the room between 2:30 and 3 o'clock on the day Cookenboo was hurt and found him in bed; "he was lying in bed and there was a knot on the back of his head, and he was bleeding. * * * I think the doctor was up there * * * blood was on the bed and a little blood on his clothes. I stayed there at the time about twenty or thirty minutes. I next saw Mr. Cookenboo that evening before I went off * * * about 5:30 was sent up there. * * * He was lying in the bed * * * breathing heavily with a rattle in his chest like. * * * I didn't disturb him. * * * I didn't talk to him or say anything to him." Dr. C. A. Holshouser testified that he got an emergency call between 1:30 and 2 o'clock p. m. on January 28, 1933, and went to Cookenboo's room at the hotel. He "was in bed with a laceration about one inch long, a cut just slightly above and a little bit posterior to the right ear; he was lying there with no particular complaint; he was in pretty good physical condition, pulse normal and respiration normal, and he told me as I came in he had hit his head and caused this little laceration there and he wanted me to fix it up for him." The doctor did not notice any odor of liquor about Cookenboo's breath, "he didn't at the time appear to be drunk; he was not drunk. * * * I chatted with him for a while and found out he was physically able to go wash off this blood, which

was dry and clotted; I found out he was able to go with very slight assistance, to go to the wash basin and he got out of bed and went over to the basin and sat in a chair and I washed his wound out with soap and water, and cut a little bit of hair away around the laceration, and put iodine dressing on it and put him back to bed and talked to him awhile and gave him a sedative and left." The doctor was there about thirty minutes. About 10 o'clock the next morning he was called by some one from the hotel and told Mr. Cookenboo was dead; went over and examined the body. There was no blood coming from Cookenboo's nose or ears when he first went there, as witness looked specially for this. He did not find anything abnormal about the eyes; did not take his temperature, but from observation, thought it was normal; he talked coherently and was perfectly rational.

The hotel maid or housekeeper was recalled by the plaintiff and described the condition and location of the furniture, etc., in the room occupied by Cookenboo. The bed was next to the wall; a large trunk was by the bed; there was a radio and writing desk, dresser, and rocking-chair and a baggage bench. "It was a crowded room." There was a washstand or lavatory against the wall on one side of the room. In going into the bathroom, "you have to go up a high step, about that high (indicating with hands) and there was a toilet; and then there was another step to go to the shower. That step-up was from the room into the shower."

The evidence offered by defendant was by a doctor who had known and treated deceased for several years as to the condition of his health and another physician who testified as an expert in response to hypothetical questions, and the hotel manager. The latter described the condition of deceased before his injury in the automobile accident, as being good, but subsequent thereto he had been "gradually getting weaker"; visited Marlin or Mineral Wells health resorts; left the hotel of witness once because the latter objected to having whisky in the hotel; also complained about his head when he tried to walk and it seemed to be getting worse all the time. "When Mr. Cookenboo would be sitting down in the lobby and was ready to get up, it would be difficult for him to rise; he had to stretch out his legs to get on his feet again. His hand was very shaky when he was writing.

When he talked you could hardly understand him * * * found practically an empty whisky bottle in Mr. Cookenboo's room" the day he was injured.

 As stated earlier in this opinion, we agree with the trial court that the evidence as to the condition of Mr. Cookenboo's health, his drinking, etc., was such as to go to the jury; but we do not approve the finding that there was no substantial evidence that the injury was received accidentally within the meaning of the insurance certificate, when properly interpreted under the law. The ruling of the lower court permitting the statement of the deceased, made to the hotel maid, that "I fell," to go to the jury as a part of the res gestæ, was correct. Travelers' Insurance Company v. Mosley, 3 Wall. (75 U.S.) 397, 19 L.Ed. 437, and annotations in Rose's Notes (Revised Edition), vol. 6, p. 841 et seq. The evidence conclusively showed that he had received an external injury on the side of the head, just behind the right ear, from which he suffered the loss of a large quantity of blood, and the issue arose as to whether this was accidental, in the sense that he had stumbled or fallen, striking his head against some object, or had collapsed and fallen, as the result, in whole or in part, of disease. There was no suggestion of attack by another or of attempt at self-destruction. The lower judge concluded that the evidence as to whether his death was caused by a hemorrhage resulting from this blow or from disease was such as justified its submission to the jury, and as to which, as above stated, we agree with him. If deceased did stumble or in any other manner accidentally fall against some object which inflicted the injury and this injury alone caused his death, we think clearly, the plaintiff is entitled to recover, for the fall and death would not have been due to disease. The jury was entitled to consider the situation and location of objects in the room, and the step-up from the room to the bath and shower, together with the statement of the deceased, that "I fell," in determining how the wound was inflicted. In doing so, they had the right, in view of the state of the evidence, to say also whether he fell from a temporary condition or dizziness, not due to arteriosclerosis, nephritis, or other disease, but a weakness caused by loss of appetite or other inconsequential condition. Manufacturers' Accident Indemnity Co. v.

Dorgan (C.C.A.) 58 F. 945, 22 L.R.A. 620; U. S. Fidelity & Guaranty Co. v. Blum (C.C.A.) 270 F. 946; Fairclough v. Fidelity & Casualty Co., 54 App.D.C. 286, 297 F. 681. On the other hand, we think if they should find the deceased was afflicted with any of the diseases alleged by defendant and testified to, and his fall and injury were caused by the bursting of a blood vessel in the brain or other effects of one or more of these diseases, or that he would not have died from the blow but for the presence of disease in his body, then the plaintiff should not recover.

For the reasons assigned, the verdict and judgment appealed from are reversed and this case is remanded for further proceedings not inconsistent with the views herein expressed.