## TIPPENS v. METROPOLITAN LIFE INS. CO.
### No. 8773.

Circuit Court of Appeals, Fifth Circuit.
Nov. 14, 1938.

Carl T. Hudgins, of Decatur, Ga., for appellant.

C. Baxter Jones, of Macon, Ga., and Walter G. Cornett, of Athens, Ga., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit, on a policy of life insurance providing double indemnity for accidental death, was against the insurer for both single and double indemnity.

Brought by the administrator on behalf of the insured's estate, the claim generally was that; one Annie Allen Ballard, living with insured as, but not legally, his wife, was, though not named as such, the real beneficiary of the policy; that, in a conspiracy with her mother, the nominal beneficiary, she had murdered the insured, and that therefore the insurer became obligated to the estate of the insured for both indemnities.

It was alleged that though advised and warned that it should not make payment to the beneficiary, the insurer, in disregard of the warning, and of the facts which it knew or ought to have known, had paid to the beneficiary the single indemnity provided in the policy for natural death, and had refused, and was refusing, the demand of the insured's estate to pay to it both the single and double indemnity due it under the policy.

Admitting that it had paid the beneficiary the ordinary death benefits provided for in the policy, defendant denied the plaintiff's claim of murder and conspiracy. Admitting that it had received a notice from the plaintiff, it denied that anything in plaintiff's notice or any facts which had come to its attention prior to the payment to the beneficiary, had shown or suggested any reason why it should not pay the beneficiary designated in the policy the ordinary death benefits due under it.

The issues having been thus joined, plaintiff, to maintain his claim, offered a mass of evidence. Some of it was original to this suit; a great part of it was that given in two former suits. One of these was a suit on the same claim appellant had earlier brought and been nonsuited in. One was a suit Annie Allen Ballard, as assignee of the beneficiary, had brought to recover double indemnity as for accidental death.

At the conclusion of plaintiff's evidence the court, on defendant's motion, ordered a nonsuit.

In support of his appeal from that order, appellant assigns two general grounds of error: (1) The sustaining of demurrers to certain portions of plaintiff's pleadings; (2) the nonsuit and dismissal of plaintiff's cause of action for insufficient evidence.

Without detailed discussion of the points made by the demurrers, and without setting out any of the pleadings to which they were sustained, it is sufficient to say that there was no reversible error in the rulings on the pleadings.

Both the first and second counts of plaintiff's petition contained many paragraphs repetitious in substance and to a great extent in verbiage, with the result that some of the same matters were set forth many times, and with slightly varying phraseology, so that the sustaining of the demurrers to specific paragraphs left the pleading in all substantial respects as it was before they were sustained. Further, plaintiff amended its petition after the exceptions were sustained, to again allege some of the matters excepted to, and in the course of the trial he was permitted the widest latitude in the offer of evidence.

If we should assume, which we by no means do, that any of the demurrers were wrongly sustained, it is plain that the error, if any, was harmless, and that these assignments present nothing substantial for our review. It remains only to consider whether plaintiff, under the applicable Georgia rule, "has proven the case alleged" * * * has presented "evidence sufficient for the jury to have made a favorable verdict." Clarke v. Order of United Commercial Travelers of America, 5 Cir., 79 F.2d 564, 565, 566. We think it clear that he has not.

Involved, confused, giving forth a most uncertain sound, the evidence as a whole leads now one way, now another, but never as evidence relied on for a verdict should, to a definite, probable conclusion.

A careful examination of the facts and circumstances preceding and connected with the finding of the body, and its condition when found, as the record discloses them, shows that at their best for the murder theory upon which appellant's case rests, they raise only a suspicion of foul play on the part of some one in no manner identified as the murderer; that they leave to surmise and conjecture not only who compassed Ballard's death, but whether his death was feloniously compassed by any one, or was rather the result of disease or accident, or of a combination of both. They certainly do not point with any definiteness to Annie Allen Ballard, for many years his actual, if not, because of the terms of Ballard's divorce decree, his legal wife, as his murderess, or connect her in any definite way with his

death. Certainly they do not in any manner tend to prove a conspiracy between her and her mother, the named beneficiary, to compass it. A mind convinced beforehand of her guilt, and determined to find proof of it in any unfavorable circumstance, might see proof of it in some of the testimony, for to an accuser, as to the jealous, "trifles light as air are confirmations strong as proof of holy writ." But for the consideration of a jury, the facts and circumstances, given their greatest significance against the accused, prove no more than that, justly or unjustly, she thought the deceased was, and accused him of being, in a state of drunkenness, and angry with him for it, in her anger she berated, abused and struck him. No one saw her strike a lethal blow; no one testifies that she intended to do so, nor is there any circumstance in the record from which that intention can be reasonably inferred. Indeed, the circumstances tending to a contrary conclusion are so numerous, and so inconsistent with the theory that she did kill him, as to leave no firm or stable ground for a verdict that she did, to rest upon.

Ballard's body was found about 10:30 on Saturday morning, July 24th, lying on the pathway to the spring, at a distance from the house variously estimated at from 100 to 250 yards. It was stretched out on the ground without any wearing apparel on, except a hat, and with a sheet wrapped around it. The head was lying on some small rocks up next to the hog lot fence; part of the top rail had been split and pulled off the fence and was lying near Ballard, and there was a splinter and nail protruding from the fence post. A doctor was summoned, and in the afternoon an inquest was held after the body had been removed to Ballard's room. The verdict of the coroner's jury was that his "death was caused by a wound in the neck made by some cutting instrument." Annie Ballard returned from Gainesville at the time of the inquest, which was in the afternoon.

In due course Mrs. Lou Allen filed proofs of death, showing that death was the result of heart failure. On October 26, 1932, appellee issued its check to her order, the check was endorsed by Mrs. Lou Allen and Mrs. George H. Ballard, and the money was paid to the latter under an understanding she testified she had had when her mother was named beneficiary that this was done to protect Annie in receiving the money.

On January 9, 1933, attorneys for Mrs. Lou Allen made claim that Ballard's death was the result of an accident, and an autopsy was made on March 31, 1933. On June 28, 1933 a suit was filed for Mrs. Lou Allen under the double indemnity provision of the policy, but later dismissed, she saying she did not authorize it. On November 27, 1933 Mrs. Annie Ballard, as assignee of her mother, filed a new suit claiming accidental death. On November 13, 1934, Tippens qualified as temporary administrator of Ballard's estate and filed suit against appellee, claiming $10,000 upon substantially the same allegations made in this suit, except that he did not claim that the change of beneficiary was forged. This suit and Mrs. Ballard's suit were removed to the United States District Court at Gainesville, and there consolidated for the purpose of trial.

Mrs. Ballard offered proof that the insured suffered an accidental death; Mr. Tippens, that the death was murder. At the close of the evidence defendant was awarded an involuntary nonsuit against Tippens and, Mrs. Ballard's suit going to a jury, there resulted a verdict in it for defendant that the death was not accidental. This suit, filed January 7, 1937, was tried substantially on the evidence in the Gainesville suit.

It will serve no useful purpose to set out in any detail the conglomerate mass of inconsistent circumstances plaintiff has assembled in the record, to establish his claim that Annie Ballard murdered the deceased. The facts, sordid as they are, in no manner make out or tend to make out, a case of murder against her.

In 1915 one George Bullock, about 37 years of age, married and living in Atlanta, met and became intimate with Annie Allen, a mountain girl between 20 and 25 years of age. In or about the year 1919 Annie and George left Atlanta and were later heard from while living together in Greenville, North Carolina, under the name of Mr. and Mrs. G. H. Ballard. On October 22, 1923 Mrs. Sallie Tippens Bullock was granted a total divorce, but Bullock's disabilities to marry were not removed, and the record is silent as to their later removal. On April 20, 1927 appellee issued its policy of life insurance upon the application of George H. Ballard, aged 52, naming his wife, Annie Ballard, as beneficiary. The policy provided single indem-

nity for ordinary death in the sum of $5000, and double indemnity[1] for $5000. The right to change the beneficiary was reserved and on August 7, 1931 on a change of beneficiary form, Mrs. Ballard's mother, Mrs. Lou Allen, became the designated beneficiary.

Before or at about that time the Ballards became involved in criminal charges in North Carolina, and in the summer of 1932 they visited the Allen's mountain home in Georgia, where Ballard is reputed to have lived for the most part in hiding, at a little camp in the woods, until a short while before his death at the Allen home. At that time Ballard was over six feet tall, and weighed 250 to 275 pounds; Annie was about five feet eight and weighed around 120 pounds. About July 3, 1932 Annie Ballard went back to North Carolina, and while there was arrested. Making a bond, the money for which was wired to her by Ballard, she was released. On Friday, July 23, Ballard was in bed at the Allen home, complaining of being ill, and one J. H. Allen, a boy of sixteen, living with but not related to the Allens, went to Cleveland seven miles away, in the Ballard car, for a doctor. While he was there Mrs. Ballard alighted from a bus, and, according to the testimony of J. H. Allen, commenced cursing and abusing him for driving her car, and on the journey home cursed and vilified Ballard. Allen testified that after the doctor had gone, and at about 7 o'clock that evening, Ballard was groaning on the bed and Mrs. Ballard took off her slipper and beat Ballard over the head and face with the heel, saying that nothing was the matter with him except that he was drunk, and that thereafter, except for the time between 7 and 8:30 that night, when Annie was gone from the house, she and Ballard fussed and quarreled most of the night.

There was testimony that Ballard had been in bad physical condition so that some one had had to sit up with him for a night or two before, and there was testimony that he had not been sick. There was testimony that he drank a good deal, and some testimony that he did not drink. Carl Allen, Annie's brother, testified that on Saturday morning he went into Ballard's room, and found him about the same as he had been the day before, Ballard telling him he felt mighty bad.

In addition to the evidence of J. H. Allen that Annie Ballard attacked and beat her husband with a slipper, plaintiff offered the evidence of Carl Allen, given on a former trial, that some time after Ballard's death Annie had accused him of murdering Ballard, and he had said to her, "You know who killed him; you beat him over the head with the tongs," and Annie Ballard said "I hit him over the feet with them," and the evidence of J. H. Allen that Carl Allen had made this accusation against her in Ballard's room, on Friday night.

There was evidence too, that Annie Ballard had left the house between 7 and 8 o'clock that night, and that later that night she came into the room occupied by J. H. and Carl Allen asking about her money in the trunk in that room; that she had said something about she was going to put an end to it; that she had said she was going to quiet him; that she fumbled about for something among the bags and boxes she had brought from North Carolina, but no one testified to what she found; that in the morning about 9:30 she and her father drove to Gainesville.

There was testimony that Ballard's room was where he could hear and see strangers approaching up a long driveway to the home; that he was very much afraid of and was hiding from officers of the law, and kept a constant lookout for strangers; that at about 8 o'clock of the morning of the day Ballard was found dead some state veterinarian officers came up to the place in an automobile, and that when still later, about 9:30 Annie and her father drove away, as she passed Carl in the field she called out to him—"You ought to have seen him run a while ago."

There was testimony that Annie and George Ballard had quarreled frequently in years past. One of her brothers testified that she had, at one time, several years before, endeavored to poison Ballard.

The testimony of the physician who examined the body was that there was a bruise on the back of his head, and a superficial wound in the neck appearing to have been made with a dull object, or knife,

[1] "As the result directly and independently of all other causes of bodily injury sustained through external, violent and accidental means provided * * * 5, that death * * * shall not be caused by or contributed to, directly or indirectly, or wholly or partially by disease or bodily or mental infirmity."

 

sufficient, because it cut a vein, to have caused his bleeding to death in time. There was testimony in connection with the autopsy about the wound, but this was greatly confused by the admitted fact that the undertaker, in preparing the body for burial, had inserted his cannula into the opening. There was testimony, too, that either the blow on the head or the wound in the neck could have killed him, and there was testimony supporting the theory of death by disease. There was testimony that a blow from a slipper might, if hard enough, have caused concussion and death, and that a blow from fire tongs might have There was testimony that as heavy a man as Ballard was, in trying to climb the fence and falling when it broke, could have cut his neck on a splinter or nail, and that he could have fallen on the rocks with such force as to have caused his death, and there was testimony that his death might have been from natural causes.

When it is remembered that all of this mass of facts and circumstances was offered by the plaintiff, and that no one testified that Annie Ballard struck, or intended to strike, a lethal blow; when it is seen too, that the record plaintiff thus made teems with inconsistencies, not reconcilable with the fact that the night before the body was found beside the spring, deceased's wife had killed him by hitting him with a slipper, or with tongs, it becomes quite clear that the nonsuit was rightly directed, leaving plaintiff with the right, under the Georgia rule, to sue again, if and when he can obtain evidence tending consistently to make out a case, for a jury verdict.

▬ The rule which prevents a beneficiary who has murdered the insured from recovering on an insurance policy is grounded in the public policy against permitting a willful and felonious murderer to profit by his felony. It is uniformly given application where the proof clearly shows a willful and felonious taking of life by the beneficiary or by his procurement. Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591, 8 S.Ct. 877, 29 L.Ed. 997; Smith v. Todd, 155 S.C. 323, 152 S.E. 506, 70 A.L.R. 1529, and note; State of West Virginia v. Phoenix Mutual Life Ins. Co., 114 W.Va. 109, 170 S.E. 909, 91 A.L.R. 1482 and note; 37 C.J. Sec. 341 p. 576.

It has no application where, even though acts of the beneficiary caused, they were without the felonious intent to cause death. 37 C.J. Sec. 341 Notes 93–94; Holdom v. Ancient Order, 159 Ill. 619, 43 N.E. 772, 31 L.R.A. 67, 50 Am.St.Rep. 183. Neither can it be applied to a case where, as here, the circumstances the record details leave in doubt and confusion whether the deceased's death was from natural causes, was accidental from a fall at the fence, accidental from a blow, given him by Annie Ballard in a quarrel with him, but with no intention to kill, or was the result of a deliberate and premeditated murder by some one not disclosed.

▬ In such a case the jury may not be left to speculate upon causes. Marlowe v. Travelers' Ins. Co. of Hartford, 313 Pa. 430, 169 A. 100. In such a case the plaintiff, whose duty it was, as representative of the deceased's estate, to make proof of his claim that the beneficiary murdered the deceased, must suffer a nonsuit for failing to do so.

The judgment of nonsuit was right. It is affirmed.