## NEW YORK LIFE INS. CO. v. HATCHER et al.

### No. 9435.

Circuit Court of Appeals, Fifth Circuit.

Oct. 17, 1940.

Shepard Bryan, of Atlanta, Ga., and R. Lanier Anderson, Jr., of Macon, Ga., for appellant.

Furman Smith, of Atlanta, Ga., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The main question here is whether a verdict should have been instructed for the appellant Insurance Company in the trial of suits upon two insurance policies issued by it on the life of R. W. Hatcher. The face amount of each policy was paid into court, and the contest was over the promise to pay "double the face of this policy upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause. * * * This double indemnity will not apply if the insured's death resulted * * * from physical or mental

infirmity or directly or indirectly from illness or disease of any kind." Appellees had the burden of showing the death was of the sort described: Ryan v. Continental Casualty Co., 5 Cir., 47 F.2d 472; Travelers' Insurance Co. v. Wilkes, 5 Cir., 76 F.2d 701; Tippens v. Metropolitan Life Ins. Co., 5 Cir., 99 F.2d 671. The meaning and application of such policy words is further illustrated in other recent cases in this court: Travelers' Protective Ass'n v. Davis, 5 Cir., 67 F.2d 260; Davis v. Jefferson Standard Life Ins. Co., 5 Cir., 73 F.2d 330, 96 A.L.R. 599; Stewart v. Travelers Protective Ass'n, 5 Cir., 81 F.2d 25; Clarke v. Order of United Commercial Travelers, 5 Cir., 99 F.2d 457. The policies here are Georgia contracts, but we find no unusual or divergent rule established in the Supreme Court of Georgia. The leading case is Thornton v. Travelers' Insurance Co., 116 Ga. 121, at page 126, 42 S.E. 287, at page 289, 94 Am.St.Rep. 99, where the general principle is stated, "Accident policies generally contain a clause the purpose of which is to relieve the insurer from responsibility in case of death or disability * * * from disease. The language of this clause is not the same in all policies, and the determination of the question whether, under such a clause, the company is relieved in a particular case, depends upon the exact language in which the exception is couched." Substantially the exact language defining the liability in the present policies—it is not an exception—was dealt with in the above cited cases in this court. It is simple and plain. To be within the double indemnity the death must have directly resulted from a bodily injury effected solely by an external, violent and accidental cause, and it must not have resulted from physical or mental infirmity or directly or indirectly from illness or disease of any kind. The common meaning is to be given each term.

 The evidence is clear that the insured, a man of sixty-five years of age, height six feet one inch, weight 190 to 200 pounds, fell while walking alone in his own home, struck his face and temple against a sharp corner of the woodwork near the floor, cutting his temple so that a pool of blood was formed on the floor as he lay unconscious for perhaps one hour. He could not remember just what happened, but appeared for several days to have no serious results, and then began to have severe headaches, which on the tenth day became unbearable, he became unconscious and the next day died. An autopsy showed he had a number of diseased organs, and especially a general arterio-sclerosis, on the severity of which for his age the doctors differed. The autopsy further showed near the external wound on the head an extensive hemorrhage on the brain under the tough membrane surrounding the brain (called the dura mater) and between it and the other surrounding membranes. The cranium was not fractured nor the tissue within the brain injured. This sub-dural hemorrhage was plainly several days old at death. Another more recent hemorrhage was found within and at the base of the brain in the very vital region called the pons. This pontine hemorrhage all the doctors agreed was the immediate cause of death. One of them testified that he thought this hemorrhage was due simply to the arterial sclerosis there and the very high blood pressure, as high as 260, which was observed just before death, and that it had no connection with the other hemorrhage or the fall. Other doctors thought the sub-dural hemorrhage, a slow seeping of blood which did not at once injure the tissues of the brain but could not escape through the dura mater and cranium, created a pressure on the brain in the course of ten days which caused first the headaches and high blood pressure, and at last directly caused the pontine hemorrhage. Some of them, however, thought the sub-dural hemorrhage was spontaneous, that is, was due to the diseased condition of an artery which there broke, and might with great probability have caused the insured's fall rather than have been caused by it; or if caused by the fall, the fall was not the only cause, but the principal cause was the diseased arterial condition. There was, however, expert opinion from doctors whom all the others said were of skill and reputation, that the arterio-sclerosis was only an inevitable aging, like the brittleness of an old person's bones, and was not really an illness or disease in a person of sixty-five years, that the insured's blood pressure was not unduly high before he fell, nor for several days afterwards; that sub-dural hemorrhages were almost always of traumatic origin and not spontaneous; that they did not proceed from arteries, which do sometimes burst in the brain substance and produce "strokes" or apoplexies, but from veins

outside the brain which are not affected by sclerosis as the arteries are. According to these doctors the fall alone caused the sub-dural hemorrhage which directly and as a natural consequence even in a younger person with stronger arteries, if not relieved by an operation, would and did in this instance cause the secondary pontine hemorrhage. Without reviewing all the circumstances, we are of opinion that the jury could reasonably take that view and conclude that the death was solely and independently of any weaknesses or diseases that the insured may have had, the result of his fall.

On the question whether the fall which caused the injury which in turn caused the death was an accident, or itself due to disease, we think the jury could from the circumstances conclude that the insured slipped and fell rather than that he fainted and fell. Either was possible; but he had fainted only twice in his life, and then when sitting down, seven or eight years before. Seven months before his fall he had had an automobile accident in which his left leg and jaw were broken, but was again able to walk on his shortened leg with the aid of a cane, to drive his automobile, and to go daily to his place of business, manifesting as his attending physicians thought an unusual vitality for his years. There was no particular reason why he should have fainted, and no clear evidence that he did. He was unable to remember what happened except that he felt nausea; and because he had that when he fainted before, he said he must have fainted. This was only his own opinion. It is not conclusive on the plaintiffs here. Against it is medical testimony that one in fainting rarely falls forward prone, but sits or sinks down. This floor (his daughter's room) was smooth and polished, and at the place where he fell there was a light rug the corner of which he would pass on his left in going to the door against the frame of which his head struck. He was walking with his cane in his left hand, his left leg being the short and weak one, and if the cane was placed on the rug it would easily slip and cause him to fall. The rug was found to be pushed together as though this had happened. The rug, the head injury, and his position on the floor as indicated by the blood, make just such a picture as such a slip and fall would make. As a matter of common experience such falls on rugs on polished floors are much more frequent than faintings. A bodily injury thus resulting would be due to an external, violent and accidental cause. What did happen was a jury question. We do not say that a fall due to a sudden fainting, if not the result of disease, would not suffice; but we have discussed the question as the judge presented it to the jury and as it has been argued here.

Some charges and refusals to charge are specified as error, but were not specially argued either orally or by brief. The charge given was fair and comprehensive though simple and short. We think the contentions were plainly stated. Some of the requests might appropriately have been given, but we are of opinion that no reversible error appears in their refusal in view of the charges given.

Judgment affirmed.