Estate of Wilkins: Whaley, Administrator of Kurase-
thas, Appellant, vs. Avery, Administrator, Respondent.

*January 10—February 8, 1927.*

*Wills: Right to make and revoke: Beneficiary killing testatrix ren-
ders will inoperative as to him: Equitable powers of county
court.*

1. Under sec. 1, art. I, and sec. 13, art. XIV, Const., the right to
   dispose of property by will to any person and to the exclusion
   of others, with certain exceptions, is a sacred right.    The
   legislature cannot take away or substantially impair this right,
   and the courts cannot change or modify a will, or substitute in
   its place one which it may deem more equitable and just.
   p. 113.

2. The power to make a will implies the power to revoke the same,
   and the power of revoking is as sacred as the power of making.
   p. 114.

3. Under sec. 238.14, Stats., the beneficiary of a will, who by the
   commission of a crime upon the testator causes his death, may
   nevertheless take under the will if the testator lives a reason-
   able time thereafter, during which he retains competency to
   make a new will or to revoke or modify one already made, but
   fails or refuses to do so.   p. 115.

4. Under the equitable doctrine that one shall not profit by his own
   wrong, the will of a woman was revoked as regards a bene-
   ficiary who shot and instantly killed her, although the mur-
   derer had no knowledge of the existence of the will.   [It may
   be, also, that the exception in sec. 238.14, Stats., would operate
   as an implied revocation under the facts in this case.]   pp. 119,
   120.

5. The county court, in construing a will, acts pursuant to the
   equitable powers possessed by it, and all the doctrines and
   maxims applicable generally to equity courts apply.   p. 118.

[6. Whether the doctrine that a man shall not profit by his own
   wrong would affect the right of a murderer to take under the
   statute of descent, not involved in this case and not decided.]
   p. 121.

Appeal from part of a judgment of the county court of
Rock county: Charles L. Fifield, Judge.   *Affirmed.*

This appeal is by the administrator with the will annexed
of the estate of Athanacios Kurasethas, deceased, from part

of a decree of the county court construing the will of one Edith Wilkins, deceased.

The will of Edith Wilkins, deceased, among other things, provided for a legacy of $5,000 to Kurasethas, hereinafter referred to as "K.," and he was also named as beneficiary, with others, under the residuary clause of the instrument.

It is conceded that K. murdered Edith Wilkins, and immediately thereafter committed suicide. The county court, upon an application made to construe the will, decreed that K. could not and did not take thereunder.

For the appellant there was a brief by *Richardson & Dunwiddie* and *E. H. Peterson,* all of Janesville, and oral argument by *Stanley J. Dunwiddie.*

For the respondent there was a brief by *M. O. Mouat,* and oral argument by *Mr. Mouat* and *Mr. L. A. Avery,* both of Janesville.

DOERFLER, J. The sole question presented on this appeal involves the effect to be given to those provisions of the will which provide certain bequests for K., under the peculiar facts and circumstances heretofore related. Our Reports contain no precedent, and the question to be determined is one of first impression in this state. The exhaustive briefs presented by counsel have been of great aid to the court and have lightened its burdens.

The record does not disclose that K. when he committed the murder had knowledge of the will, so that in that respect the case differs from a number of others in foreign jurisdictions where the murderer, with knowledge of the contents of a will, commits the act for the express purpose of preventing the testator from changing his will to his detriment.

In the case of *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627, it is said:

"The right to take property by inheritance or by will is a natural right protected by the constitution which cannot be

wholly taken away or substantially impaired by the legislature. . . .

"So clear does it seem to us from the historical point of view that the right to take property by inheritance or will has existed in some form among civilized nations from the time when the memory of man runneth not to the contrary, and so conclusive seems the argument that these rights are a part of the inherent rights which governments, under our conception, are established to conserve, that we feel entirely justified in rejecting the *dictum* so frequently asserted by such a vast array of courts that these rights are purely statutory and may be wholly taken away by the legislature."

In *Will of Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778, this court held:

"The right to make a will is more sacred than the right to make a contract. The right to make a will is incidental to the right to acquire property and so is one of the inherent rights guaranteed by the constitution. It antedates common and civil law. It is sacred in all nations and under all conditions. It is guaranteed by sec. 1, art. I, of the constitution and also by sec. 13, art. XIV."

The language thus quoted is clear and explicit. It contains no ambiguities, and it is expressive of a constitutional guaranty relating both to personal rights and rights of property. So firmly are the foregoing doctrines, expressed in the *Nunnemacher* and *Rice Cases* and in numerous other cases decided by this court, entrenched in the jurisprudence of this state, that any attempt at this date to modify or upset them must be deemed futile. This sacred right to make a will rests entirely with the testator, who under our law can dispose of his property in accordance with his volition, excepting only as to certain rights which are extended by statute to a specified class of persons, designed for their protection as a matter of public policy. Under this exception comes the right of a widow to renounce the provisions of the will by accepting her statutory rights of dower. A testator may ignore wholly, if he desires, those in close relation to him by ties of blood,

and he may bestow his devises and bequests upon persons who are ordinarily not deemed the objects of his bounty. Nor is any one permitted to make a will for him; neither can the courts change or modify a will, or substitute in its place one which they deem more equitable and just, for to permit this would destroy the sacredness of a will and would substitute in its place the will of another.

In approaching, therefore, the consideration of the important issue confronting us, we must not lose sight of these and other fundamentals, and we will endeavor to harmonize our holding with them instead of modifying or upsetting them. It is said that "law" is the perfection of human reason. In a democratic form of government like our own, it is designed to promote human welfare. It recognizes the rights of persons and of property, and to vindicate such rights and to secure remedies for the infringement thereof courts are created and established. Each branch of the government is supreme in its field, and if one branch invades the territory of another, contrary to the fundamental law, it results in an attack upon the very foundation of the government itself, and the result must necessarily be disastrous and revolutionary in its nature.

Under the provisions of sec. 238.14 of the Statutes "The power to make a will implies the power to revoke the same." Edith Wilkins, therefore, not only had the sacred right to make the will in question, but she also possessed the right and power at any time during her life to revoke the same, and the power of revocation is equally as sacred as the power of making. It not infrequently happens that a testator arrives at a determination to revoke or modify his will, but before he is enabled to effectuate a change or revocation he meets with sudden death by accident or disease. Such occurrences, however, cannot affect the enforcement of the will so made, regardless of the high degree of proof that may be offered with respect to the testator's determination. In instances

like these, sec. 238.14 comes into operation, for it determines how a will or any part thereof may be revoked or modified. A beneficiary under a will may be guilty of the commission of an atrocious crime upon the testator which may result in suffering and eventual death. Still, if the testator lives a reasonable time after the commission of the offense, and during such time retains his competency to make a new will or to revoke or modify the one already made, but fails or refuses to make a change, the will nevertheless becomes effective and must be enforced in accordance with its terms, and the offender will take thereunder, provided he is a beneficiary, notwithstanding his offense.

The commission of crime does not disqualify one from taking under a will, unless it be under facts and circumstances as appear in the instant or similar cases. Under the facts in the instant case, the shooting of Edith Wilkins resulted in instantaneous death. K. survived her but a few seconds at most, and his act of suicide by shooting also resulted in instantaneous death. Had the death of both parties resulted from disease or from accident, there can be no question but that the survivor would take, even though he survived for the short period of a second. Edith Wilkins lost her life as the result of the premeditated act of K., and such fact distinguishes this case from the other incidents above alluded to. By the commission of murder she was, by the very act of the murderer, deprived of the sacred right to change her will in accordance with her volition. Such a right, as has already been stated, was inherent in her, was sacred, and of this right she was deprived.

Under the civil law as it obtained for centuries in European countries where it was adopted, a murderer could not take property devised or bequeathed to him in a will under circumstances existing in the instant case. Such was and is also the rule under the Code Napoleon. This is likewise true under the common law in England. In fact, this seems to

be the rule quite generally recognized in the law of all civilized nations. See the following cases and authorities cited in respondent's brief, viz.: *Riggs v. Palmer,* 115 N. Y. 506, 22 N. E. 188; *Wall v. Pfanschmidt,* 265 Ill. 180, 106 N. E. 785; 28 Ruling Case Law, 75; 40 Cyc. 1063; Wharton, Homicide (3d ed.) § 665. In 40 Cyc. 1063, it is said:

"Under the civil law one cannot take property by inheritance . . . from one whom he has murdered. And the few common-law decisions on the subject hold that a beneficiary under a will who murders the testator to make the will operative, or who is guilty of a lower grade of crime, such as manslaughter, in killing the testator, cannot take under the will. The principle upon which the beneficiary is held incapable of taking under the will of the person he kills is that no one can take advantage of his own wrong."

In *Riggs v. Palmer,* decided in 1889 and reported in 115 N. Y. 506, 22 N. E. 188, and in 5 L. R. A. 340, the defendant, Elmer E. Palmer, was a beneficiary under the will of Francis B. Palmer. The defendant murdered the testator, knowing that he was a beneficiary under the will, with the intention of preventing the testator from revoking or modifying the same. We have, therefore, under the facts presented in the *Riggs Case,* one similar in all respects to the instant case, with one exception: that in the latter the murderer had no knowledge of the provisions of the will and that he did not commit the crime for the purpose of preventing the testatrix from revoking or modifying her will. The action was brought by the plaintiff in the *Riggs Case* in a court of equity in order to restrain the defendant from taking anything under the will. In the opinion in that case the court says:

"Here there was no certainty that this murderer would survive the testator, or that the testator would not change his will, and there was no certainty that he would get this property if nature was allowed to take its course. He therefore murdered the testator expressly to vest himself with an estate. Under such circumstances, what law, human or divine,

will allow him to take the estate and enjoy the fruits of his crime? .The will spoke and became operative at the death of the testator. He caused that death, and thus by his crime made it speak and have operation. Shall it speak and operate in his favor? If he had met the testator, and taken his property by force, he would have had no title to it. Shall he acquire title by murdering him? If he had gone to the testator's house, and by force compelled him, or by fraud or undue influence had induced him, to will him his property, the law would not allow him to hold it. But can he give effect and operation to a will by murder, and yet take the property? To answer these questions in the affirmative, it seems to me, would be a reproach to the jurisprudence of our state, and an offense against public policy."

The opinion in the *Riggs Case* has been criticised by a number of courts, yet in the main we consider the logic of that case substantially sound and irrefutable. Note the language above quoted in the opinion in the *Riggs Case:* "The will spoke and became operative at the death of the testator. He caused that death, and thus by his crime made it speak and have operation. Shall it speak and operate in his favor?" The *Riggs Case* is based upon the theory that, notwithstanding the murder, the will spoke and became operative instantaneously upon the death of the testator, but that the murderer by his act, under the equitable doctrine that a man shall not profit by his own wrong, shall not be permitted to enjoy the fruits resulting from his wrong. That such is the holding of the *Riggs Case* is further made clear in the opinion in *Ellerson v. Westcott,* 148 N. Y. 149, 42 N. E. 540, where the facts involved were similar to those in the *Riggs Case.* Briefly stated, these New York cases hold that equity comes into operation upon the very threshold of the murderer's taking and "stays his hand." That this constitutes good, equitable doctrine cannot be denied. It is our view, however, that the act of vesting and that of taking are simultaneous; that there can be no vesting without a taking, even if that taking be only for the short period of a second; that if there

be a vesting, even for the shortest unit of time, there is visited upon the criminal a punishment in addition to that provided for by law. In other words, it amounts to an attainder or a corruption of blood, prohibited by the constitution. While it must be conceded in the instant case that the will remained in force up to the time of the death of the testatrix, it became wholly inoperative, in so far as the rights of K. were concerned, at the very moment of her death, and if this be so, there was neither a vesting nor a taking in contemplation of law.

And here it must be borne in mind that the crime committed by K. did not directly affect any of the provisions of the will other than those in which he was interested, but that such other provisions became fully operative and must be given effect, to the same extent as though Edith Wilkins had died a natural death or as the result of an accident. If, notwithstanding the murder, it be held that K. can take under the will and that the will becomes operative as to him, then it follows as a logical consequence that a murderer, under the facts herein, can deprive a testator of the sacred right to revoke a will or to modify it, and no logical distinction can be drawn between a case where the murder is committed expressly for the purpose of coming into an untimely possession of a bequest or devise, and one where the offense is committed where the murderer has not this specific intent. In either event the effect is the same, and in both instances the testator is deprived of the same right.

In this state the county court has jurisdiction to construe a will, and where this court can afford as complete a remedy as is granted to the circuit court its jurisdiction is exclusive. Such appears not to be the case in New York, where a separate action is begun in equity in a court of general jurisdiction, as will appear in the *Riggs* and *Ellerson Cases, supra*. But when the county court, in proceedings therein brought to construe a will, acts, it does so pursuant to the equitable

Estate of Wilkins, 192 Wis. 111.

powers possessed by it. All of the doctrines and maxims of equity applicable to courts of equity generally, are appli-- cable in a county court when it proceeds in matters of will construction. When the proceedings in the matter of the construction of the will of Edith Wilkins came before the county court of Rock county for hearing, the judge thereof became the chancellor, and by his decree he in effect held that the will became inoperative at the time of the death of the testatrix, in so far as the rights of K. were concerned, and with this holding we fully agree.

The equitable doctrine that a man shall not profit by his own wrong dates back centuries in the history of the common law, and is as old as equity itself. It is recognized, as far as we are able to determine, in the laws of all civilized communities. It lies at the foundation of every religious faith, and may be said to be one of the corner-stones of the Christian religion. It is vitally essential to the administration of justice, and a careful search of our statutes fails to reveal that it was ever modified or abrogated. It therefore exists at the present day in Wisconsin, with all the force which it possessed throughout the ages, and this court in holding as it does in this opinion does not entrench upon the legislative field, but, on the contrary, its holding is in harmony with the spirit and intent of the legislature. No system of laws permits a criminal to profit by his own crime, for if this were so, the very object of all law would be subverted.

It is argued by respondent that under the provisions of sec. 238.14 of the Statutes it may be held that this will was revoked as to the provisions contained therein for the benefit of K. The section referred to deals with the manner in which wills may be revoked, and the statute contains an exception which reads as follows: "excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circum-

stances of the testator." The language used in the exception is broad and general. It was construed in *Will of Battis*, 143 Wis. 234, 126 N. W. 9, where it is said:

"The rule rests on the idea that the changed condition and circumstances of the testator respecting his property, his family or beneficiaries, imposing different moral and legal duties, affords strong evidence that the testator intended that his will should become revoked as to the provisions affected by such subsequent change."

In the *Battis Case* the court had before it the effect of a divorce granted by the court after the execution of the will, and it was there held that such divorce constituted such a change in the condition or circumstances of the testator as would operate to revoke the will with respect to the provisions therein contained affecting the other spouse. The rule as above stated in the *Battis Case* is substantially like the one contained in 28 Ruling Case Law on page 186. It becomes apparent, however, from a reading of the authorities which deal with this exception that neither the text-writers nor the courts had in view a situation such as is presented by the instant case. We therefore deem it advisable to rest our decision in chief on the views heretofore expressed; however, we are not prepared to say that the exception could not logically be construed to operate as an implied revocation of the provisions of the will in the instant case in so far as they affect K.

The language of the statute appears to be broader than the rule as above quoted from the *Battis Case,* for it says, "excepting only that nothing contained in this section shall prevent the revocation implied by law *from subsequent changes in the condition or circumstances of the testator.*" (Italics ours.) The sudden and unexpected killing of the testatrix by K. clearly effected a change in the condition of the testatrix. It deprived her of a valuable and sacred right, viz. the right to modify or change her will. The last sentence of the statute referred to reads: "The power to make a will implies the power to revoke the same." Here it must be re-

iterated that it was K. who deprived the testatrix of this sacred right to revoke her will, thus producing a changed situation not contemplated by the testatrix.

In view, however, of the construction placed upon this exception by the authorities, we have concluded primarily to rest our decision upon the theory chiefly treated in this opinion.

Numerous cases have been referred to in the briefs of counsel involving insurance contracts, where the beneficiary under an insurance policy murdered the insured in order to obtain the insurance. The decisions of the courts are uniform to the effect that the murderer cannot take under such circumstances, because he cannot obtain the benefits of a contract by the commission of crime. Numerous other cases involving the right of a murderer to take under the statutes of descent are referred to. Whether or not the doctrine herein invoked would affect the murderer's right to take under the statute of descent involves a question with which we are not concerned in this case, and our decision upon this question will be reserved until that issue is presented.

*By the Court.*—The portion of the decree from which this appeal has been taken is affirmed.