## METROPOLITAN LIFE INS. CO. v. McDAVID et al.

### No. 72.

District Court, E. D. Michigan, N. D.
June 12, 1941.

Weadock & Weadock, of Saginaw, Mich., for plaintiff.

Edward C. MacRae, of Saginaw, Mich., for Beatrice McDavid.

R. M. Van Dyne, of Flint, Mich., for Alvania McDavid.

James M. Davis, of Saginaw, Mich., for T. H. Westbrook, administrator of the Estate of Israel McDavid, deceased.

TUTTLE, District Judge.

The plaintiff, a New York corporation, filed its bill of interpleader and paid into court the sum of $3,459.24, the amount admitted by the plaintiff to be due to the lawful claimants for the proceeds of three certain insurance policies upon 'the life of Israel McDavid, deceased. One policy upon which $458.51 was due was made payable to the executor or administrator of the insured. Another policy upon which there was due $984.95 was made payable to Beatrice McDavid as wife. A third policy upon which there was due $2,015.78 was made payable to Beatrice McDavid as his wife. This third policy was a group

policy issued to General Motors Corporation and was upon the life of Israel McDavid as an employee. This group policy contained the following clause:

"If there is no designated beneficiary at the time when any benefit shall be payable to the beneficiary, then the benefit shall be paid as follows: to the wife or husband, if living, of such employee; if not living, to the children of such employee who survive such employee, equally; if none survive, to the father and mother of such employee equally, or to the survivor; if none of the above survive such employee, to the estate of such employee." Beatrice McDavid claims under the first policy as widow and heir at law. She claims as named beneficiary under the other two policies. The defendant, Alvania McDavid, is a citizen of the State of Alabama and the mother of the deceased. Aside from the wife, there are no near relatives of the deceased except his mother. The mother claims that the deceased was killed by the wife, Beatrice McDavid, under such circumstances that the wife is barred from receiving the proceeds of the policies and that the mother should receive directly in her own name the $2,015.78 due under the third policy, less proper expenses and charges of these proceedings, and that the proceeds of the other two policies should be paid to the defendant T. H. Westbrook as administrator to be administered in accordance with the laws of the State of Michigan and distributed in the same way in which they would have been distributed and applicable if Beatrice McDavid, the wife of the beneficiary, had predeceased the insured. The defendant T. H. Westbrook, as administrator of the estate of Israel McDavid, deceased, claims the proceeds of the policy for $458.51 and the policy for $984.95 to be administered by the State Probate Court.

The interesting and only disputed question involved is whether Beatrice McDavid took the life of her husband, Israel McDavid, under such circumstances that she cannot receive the proceeds of these policies as she otherwise would have done.

Israel McDavid and Beatrice McDavid were colored people. They were married in West Virginia in 1924. He was a coal miner. In the spring of 1929, they moved to Saginaw, Michigan, and he went to work in the Chevrolet foundry of General Motors. Except for slight interruptions, they lived in a single room or a small apartment in some rooming house in Saginaw and he continued to work in the Chevrolet foundry until the time of his death on August 11, 1939. At frequent intervals during this time, they quarreled and fought. Their quarreling and fighting seemed to be just an incident of their home life and did not interrupt it in any way. It was not a feud on any particular subject, but just isolated rows about anything and everything. McDavid owned an automobile, and in the afternoon of August 10, 1939, Mr. and Mrs. McDavid left the rooming house where they lived and rode around Saginaw in this automobile. They stopped and visited a colored woman whom they both knew. After that, Mr. and Mrs. McDavid went to a beer garden. The both drank a little beer. He then took her to the home of another friend and they arranged that when she was through with her visit she would meet him at still another beer garden. She kept the appointment but when she got to the beer garden McDavid was not ready to leave, so she went back to the home of her friend for another visit. When Mrs. McDavid finally left his friend to go home, she met other friends who took her in their car and to their home. She sent word by another mutual acquaintance to Mr. McDavid telling him where she had gone. She spent the evening with these friends playing cards. In the meantime, Mr. McDavid spent the evening at a beer garden with a colored man by the name of Jackson. The friends of Mrs. McDavid started to take her home some time after midnight and Mr. McDavid started home from the beer garden alone in his car some time after midnight. At a red light corner a few blocks from where the McDavids roomed, McDavid turned in front of another car and hooked his rear bumper into the front bumper of the other car. This resulted in an argument between the drivers of the two cars, a crowd gathered, and a policeman gave McDavid a ticket. Mrs. McDavid with her friends came along about that time. Mrs. McDavid's friends left her at the scene of the accident, she talked with people in the crowd, and got the erroneous idea that McDavid had been out with some other woman. She questioned McDavid as to who had been in the car with him. He was mad and walked away. Among others, Mrs. McDavid talked with Jackson, who was driving his own car, but with whom McDavid had spent the evening at the beer garden. Mrs. McDavid left

the scene of the accident and went home on foot, a distance of about five blocks. McDavid drove home in his automobile so when Mrs. McDavid got there her husband had already arrived. He was sitting on the bed in their room. He said, "I suppose you are glad I got a ticket." She replied, "Yes, maybe it will take some of that smartness out of you." That started another quarrel and it continued for some time, each saying mean and accusing things to the other. The name of Jackson figured in the quarrel because Jackson had been with McDavid during the latter part of the evening. Jackson had been at the scene of the accident, and Mrs. McDavid had not only talked with Jackson but McDavid had seen her talking with Jackson. McDavid evidently decided to take his wife into the presence of Jackson and settle the argument. In any event, he insisted that his wife go with him and they went out to the automobile. Mrs. McDavid got into the right-hand side of the front seat, and, knowing that McDavid's loaded revolver was in the pocket of the car, she took the revolver out of the pocket and put it in her handbag while McDavid was going around the front of the car to get in on the left-hand side. It is plain that Mrs. McDavid did not intend at that time to kill Mr. McDavid or anyone else, but that her purpose was to put the revolver where McDavid could not use it for any purpose while he was angry. By this time, it was two or three o'clock in the morning of August 11. They went to the rooming house where Jackson and his wife lived in a little room. The McDavids knew very well where the room was. Mrs. Jackson was asleep in the bed and Jackson was in bed but not yet asleep. The McDavids went to the front door of the house where the Jacksons roomed, McDavid knocked on the front door and somebody from upstairs called out, "Come in". The McDavids then went inside the front door and McDavid went upstairs and knocked on the door to the Jacksons' room and called to Jackson. Jackson evidently answered, because McDavid came back downstairs, got Mrs. McDavid, and they both went up to the room. Mrs. Jackson was still in bed and Jackson was sitting on the side of the bed. Mr. McDavid walked in the room first, followed by Mrs. McDavid. Mrs. McDavid sat down in the only chair in the room. McDavid walked over to the foot of the bed and asked Jackson, "Did you tell my wife there was any women in my car to-night?"

To which Jackson replied, "No, I did not." To all of which Mrs. McDavid responded, "Nobody said that." Whereupon, McDavid turned around and struck Mrs. McDavid on the side of the head and face with his hand, causing Mrs. McDavid's nose to bleed. There was much confusion and it is difficult to tell just what was said and done, but there isn't any question but that McDavid was mad, accused his wife of lying, claimed that Jackson's statement had proven Mrs. McDavid untruthful, and that in his anger McDavid struck Mrs. McDavid, made her mad and caused her nose to bleed. No one can be positive whether Mrs. McDavid in her anger immediately decided to open her handbag, get the gun and kill McDavid, or whether her first impulse was to open her handbag and get her handkerchief for use in connection with the nosebleed and while in that pursuit saw the revolver and thought about using the revolver. It is plain that the blow by Mr. McDavid and the pain and nosebleed resulting to Mrs. McDavid were sufficient cause for great anger on the part of Mrs. McDavid. There isn't any question but that Mrs. McDavid was very angry with her husband and there isn't any question but that in this anger and before there had been a cooling time she took the revolver out of her handbag, pointed it at her husband, fired all five of the shots in the revolver at her husband, three of which struck him and killed him almost instantly. She was of sound mind, it was not done in self-defense, she intended to kill him and did kill him. No better example could be found of what the courts in Michigan call "common-law voluntary manslaughter".

The statutes of Michigan expressly define murder in the first degree. Mich.Stat. Ann., Sec. 28.548, C.L.1929, Sec. 16708. In the succeeding section, the statute declares that "all other kinds of murder shall be deemed murder of the second (2nd) degree." Mich.Stat.Ann., Sec. 28.549, C.L.1929, Sec. 16709. A succeeding section provides a penalty for the crime of manslaughter but it neither defines nor grades manslaughter. Mich.Stat.Ann. Sec. 28.553, C.L., Sec. 16717. Tyler v. People, 8 Mich. 320, 337.

At common law, there were two types of manslaughter, voluntary and involuntary. Voluntary manslaughter was well defined by the Supreme Court of Michigan in the early case of Maher v.

People, 10 Mich. 212, 218, 81 Am.Dec. 781, as follows:

"If the act of killing, though intentional, be committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control, and is the result of the temporary excitement, by which the control of reason was disturbed, rather than of any wickedness of heart or cruelty or recklessness of disposition; then the law, out of indulgence to the frailty of human nature, or rather, in recognition of the laws upon which human nature is constituted, very properly regards the offense as of a less heinous character than murder, and gives it the designation of manslaughter."

See also Hurd v. People, 25 Mich. 405; People v. Lilley, 43 Mich. 521, 5 N.W. 982; People v. Burt, 51 Mich. 199, 16 N.W. 378. Involuntary manslaughter involves an unintentional killing resulting from the commission of an unlawful act not amounting to a felony or from gross negligence. The distinction between the two kinds of manslaughter was discussed in the case of People v. Ryczek, 224 Mich. 106, 194 N.W. 609. Several Michigan statutes have been enacted which define different forms of involuntary manslaughter.

 Mrs. McDavid was convicted of manslaughter for the killing of her husband and sentenced to five years' imprisonment. This court admitted the record of the criminal case in evidence in this case, although it is not binding upon it. Restatement, Restitution, Sec. 187, Comment f. The evidence in this case shows that the verdict of the jury in the state court was correct. This court now finds the fact to be that Mrs. McDavid at the time she killed her husband was not intoxicated, she was of sound mind, she was not acting in self-defense. Her husband had given her provocation for being angry, she was angry, there had not been a cooling time, she intended to kill her husband, and she did kill him.

Do these findings of fact bar her from receiving and enjoying the proceeds of the life insurance policies in force upon her husband's life at the time of his death? No case from any court has been found which passes upon this question where this kind of manslaughter is involved. There are many cases holding that murder by the beneficiary of the insured bars a recovery of the benefits, Ohio State Life Ins. Co. v. Barron, 274 Mich. 22, 263 N.W. 786; Slocum v. Metropolitan Life Ins. Co., 245 Mass. 565, 139 N.E. 816, 27 A.L.R. 1517; Smith v. Todd, 155 S.C. 323, 152 S.E. 506, 70 A.L.R. 1529; Schmidt v. Northern Life Ass'n, 112 Iowa 41, 83 N.W. 800, 51 L.R.A. 141, 84 Am.St.Rep. 323; Sharpless v. Grand Lodge, 135 Minn. 35, 159 N.W. 1086, L.R.A.1917B, 670; Mutual Life Ins. Co. v. Armstrong, 117 U.S. 591, 6 S.Ct. 877, 29 L.Ed. 997; that murder of a testator by the legatee under a will deprives of the right to take, Riggs v. Palmer, 115 N.Y. 506, 22 N.E. 188, 5 L.R.A. 340, 12 Am.St. Rep. 819; Ellerson v. Westcott, 148 N.Y. 149, 42 N.E. 540; Re Wilkins' Estate, 192 Wis. 111, 211 N.W. 652, 51 A.L.R. 1106; and that murder by a legatee deprives of the right to inherit from a relative, Garwols v. Bankers Trust Co., 251 Mich. 420, 232 N.W. 239; Re Tyler's Estate, 140 Wash. 679, 250 P. 456, 51 A.L.R. 1088. The holdings and the reasons therefor are the same for heirs, devisees and beneficiaries. While all of these adjudicated cases were in fact murder cases, the underlying reason why recovery was denied was not because the manner of death was murder, but because the killer while of sound mind, and not in self-defense, intentionally killed the benefactor. This brief definition fits all of those cases and, to the extent that the opinions go beyond that definition and say that all murder will bar, the opinions are dictum. It would be easy to think of a case of murder which should not and would not be held to bar. To illustrate, let us assume that some villain had ravished a neighbor's daughter and the parents of the daughter deliberately planned to take the life of the villain, they armed themselves with weapons and went to the place where the villain was then living, for the deliberate purpose of killing him, that all of the facts and circumstances were such that if either one of the parents had killed the villain they would have been guilty of murder, but the wife, being a poor shot and excited, missed the villain and killed her husband. Under the law of Michigan, the wife would be guilty of murder. People v. Hodges, 196 Mich. 546, 162 N.W. 966; Wharton, Criminal Law, 12th Ed., § 442; Annotation, 18 A.L.R. 917; cf. People v. Gordon, 100 Mich. 518, 59 N.W. 322. She should not be barred from receiving benefits which she otherwise would receive from life insurance on

the life of her husband. The reason she should recover would be because she did not intend to kill her husband. No cases have been found which hold that a person is barred from receiving the benefits under a life insurance policy or under a will, or by inheritance, unless he killed and intended to kill the person from whom he was to receive the benefits. In other words, as far as the law has ever gone is to prevent the recovery of benefits which would not have become due and payable except for the intentional taking of the life of the benefactor.

Now, in the same way, there are many decisions which hold that a beneficiary guilty of manslaughter is not barred from recovery in cases which are called manslaughter cases. These cases, which have held that there can be recovery and which are called manslaughter cases, are all cases in which there was no intent on the part of the killer to take the life of the benefactor. Minasian v. Aetna Life Ins. Co., 295 Mass. 1, 3 N.E.2d 17; Schreiner v. High Court, 35 Ill.App. 576; Metropolitan Life Ins. Co. v. Hill, 115 W.Va. 515, 177 S.E. 188; Throop v. Western Indemnity Co., 49 Cal.App. 322, 193 P. 263; Hull v. Metropolitan Life Ins. Co., 26 Pa. Dist. R. 197; see Restatement, Restitution, § 187, Comment e. Cf. In re Wolf, 88 Misc. 433, 150 N.Y.S. 738; In re Sparks' Estate, 172 Misc. 642, 15 N.Y.S.2d 926.

There are many kinds of manslaughter besides that with which we are dealing in the case at bar. Thus, a Michigan statute makes it manslaughter to kill a person by the careless or negligent operation of an automobile. Mich.Stat.Ann. Sec. 28.556, C.L.1929, Sec. 16743. Other examples are found in the Michigan statutes making it manslaughter where death results from attempted abortion, Mich.Stat.Ann., Sec. 28.204, C.L.1929, Sec. 16741; or from setting a spring gun or trap, Mich.Stat.Ann., Sec. 28.433, C.L.1929, Sec. 16782; or from pointing a firearm at a person, Mich.Stat. Ann., Sec. 28.561, Comp.Laws Supp. 1940, § 17115-329.

In this class of cases, the person guilty of statutory manslaughter is entirely lacking in intent to take the life of the person killed, and might, in fact, dearly love the person whose death was caused. Here, again, all of the cases which the courts have had occasion to decide have been manslaughter cases of the type which did not fall within the definition given above as carrying intent to take the life of the insured. To the extent that the courts have gone beyond the case being decided and have attempted to include all manslaughter cases as permitting recovery, the opinions have been dictum.

It is, of course, desirable that the courts should lay down some general rules for the guidance of bench and bar, and yet, on the other hand, every time a court attempts to do that it incurs the danger which always comes from dictum. The courts gave as the reason for not permitting recovery that it would be wrong for one person to profit by the death of another whose life he had intentionally taken. The particular cases being murder cases, the rule was stated too broadly to the effect that there could be no recovery in murder cases.

In the same way, the adjudicated manslaughter cases were lacking entirely in the intention to take the life of the insured. The lack of intent was recognized by the courts and was the real reason for the decision, and yet the particular cases being manslaughter cases the rule was stated too broadly, to the effect that there could be recovery in all manslaughter cases. No cases have been found in this country like the case at bar in which the beneficiary was guilty of manslaughter of the kind we have here in which the beneficiary intentionally took the life of the insured.

It is necessary to keep in mind that running through the adjudicated cases the real reason for not permitting recovery is that the beneficiary intentionally took the life of the insured and that the intentional act should not place the beneficiary in position to enjoy a benefit which would not have been enjoyed and could not have been enjoyed except for the wicked intentional killing. That manner of reasoning which has controlled these murder cases applies equally well to the case at bar, which is a manslaughter case, because here the beneficiary intentionally took the life of the insured.

It is true that the Restatement of The American Law Institute on the subject of Restitution lays down the rule broadly that if the beneficiary of a life insurance policy murders the insured, then the murderer loses all of his interest in the policy. Restatement, Restitution, § 189. It also states the rule equally broad to the effect that the beneficiary does not lose any interest in the policy where the beneficiary was guilty

only of manslaughter. Restatement, Restitution, § 189(2).

It should be borne in mind that the aim and purpose of The American Law Institute has been and is to restate the common law as it is and not as the members of The Institute think the law should be. The decisions in the other states of the United States on this subject are in accord with the Michigan decisions. The courts generally have made the distinction broadly as between murder and manslaughter. The Restatement of The American Law Institute naturally followed the same classification. No adjudicated cases have been found in any state involving the right to take in which the life of the insured had been intentionally taken by the beneficiary in a way which would constitute the crime of manslaughter. In other words, this is a new question not only in Michigan, but it has never been passed upon in the courts of any state.

This court holds that the rights of the parties shall be determined exactly as they would have been if Beatrice McDavid had died prior to the death of her husband Israel McDavid. This means that Beatrice McDavid is not entitled as beneficiary named in the policy to receive any part of the proceeds of the policies. Restatement, Restitution, § 189(1) a.

It also means that as widow and next of kin of the insured she is not entitled to receive any part of the proceeds of the policy or the estate to be administered by the State Probate Court. Restatement, Restitution, § 187. She is not to receive either directly or indirectly any part of the proceeds of any of these policies. The mother, Alvania McDavid, is to receive direct from this court all of the net proceeds of the third policy upon which there is due $2,015.78. She is also entitled to the net proceeds of the other two policies after the estate of Israel McDavid has been probated in the state court in the same manner as if Beatrice McDavid had died prior to her husband Israel McDavid. It is well established that the Federal Courts have jurisdiction under their general equity powers to determine, as between the parties to an action (the requisite diversity of citizenship existing), the interests of creditors, heirs and legatees; and, while the court cannot interfere with the administration of the estate by the Probate Court, its decision on these questions is binding upon the latter. Waterman

v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80. The net proceeds of the so-called first two policies will therefore be paid to the defendant T. H. Westbrook, as administrator of the Estate of Israel McDavid, deceased, to be administered by the state court; but the balance remaining from them after payment of administration expenses, claims, and other prior obligations is to be held in trust by him for the payment to the mother, Alvania McDavid.