The COMMERCIAL TRAVELERS MUTUAL
ACCIDENT ASSOCIATION, Appellant,

v.

Virginia M. WITTE, Appellee.

Court of Appeals of Kentucky.

July 1, 1966.

As Modified on Denial of Rehearing
Sept. 23, 1966.

O'Hara & Ruberg, Covington, for appellant.

Bassmann, Kaufmann, Root & Jolly, Newport, for appellee.

PALMORE, Chief Justice.

On August 26, 1953, the appellant, a cooperative membership insurance association domiciled in New York, issued to James E. Witte a certificate insuring him in the amount of $10,000 against loss of life "caused directly, exclusively, independently of disease, bodily infirmity or any other cause, by accidental bodily injuries resulting solely from and caused solely by external and accidental violence." The appellee, Virginia M. Witte, his wife, was named the beneficiary. On November 13, 1958, while the policy was still in force, Witte died as the result of a wound in his leg inflicted by a kitchen knife during a domestic altercation with his wife.

Mrs. Witte was indicted in the Campbell Circuit Court for the felony of voluntary manslaughter. She was tried during the

latter part of April, 1959, and found guilty of involuntary manslaughter, a misdemeanor, for which she was sentenced to 9 months in the county jail and fined $500. At the time in question [1] the crime of involuntary manslaughter, when committed with a deadly instrument or weapon, was defined as an unintentional killing through careless use of the weapon. See Sizemore v. Commonwealth, Ky., 347 S.W.2d 77, 79 (1961); Stanley's Instructions to Juries, §§ 874, 883.

Her claim as beneficiary under the policy having been rejected, Mrs. Witte brought this action against the insurance company and was awarded judgment for $10,000. The company appeals.

There are two basic questions, (1) whether Mrs. Witte's claim is defeated by her failure to file a proof of loss with the company within 90 days after her husband's death, as required by the terms of the policy and, if not (2) whether Witte's death was "accidental" within the meaning of the policy. The trial court determined both of these issues adversely to the company.

After a requirement of immediate notice in the event of death, the policy contains the following provisions relating to proof of loss:

"6. The Association upon receipt of such notice will furnish to the claimant such forms as are usually furnished by it for filing proofs of loss. If such forms are not so furnished within fifteen days after the receipt of such notice, the claimant shall be deemed to have complied with the requirements of this certificate as to proof of loss upon submitting within the time fixed in the certificate for filing proof of loss written proof covering the occurrence, character and extent of the loss for which claim is made.

"7. Affirmative proof of loss must be furnished to the Association at its said office, in case of claim for loss of time from disability, within ninety days after the termination of the period for which the Association is liable, and in case of claim for any other loss, within ninety days after the date of such loss."

Mrs. Witte was unaware of the policy's existence until some time after her husband's death. It was produced by Witte's brother, who had been appointed as personal representative of the decedent's estate. He delivered it to his attorney, Hon. Harry Luedeke, who then wrote a letter to the company under date of December 12, 1958, notifying it that Witte had met with an accidental death on November 13, 1958, and that he represented the estate, and requesting the necessary papers for filing a claim for the policy benefits.

The company answered Mr. Luedeke by a letter dated December 17, 1958, enclosing proof of loss forms and advising him that it had not received timely notice [2] and, moreover, that "the named beneficiary is 'Virginia M. Witte, wife' and not the Estate." It did not, however, send any proof of loss forms to Mrs. Witte, but employed the Pinkerton detective service to investigate the circumstances of Witte's death. Beginning on December 27, 1958, a Pinkerton detective spent about nine days "on and off" in the investigation. He did not interview Mrs. Witte, as she was not at home when he called there. Mr. Luedeke never did advise Mrs. Witte that he had the proof of loss forms, nor did he send or give them to her, because he assumed the insurance company, knowing she was the beneficiary, had itself sent her a set of the forms (as, indeed, the policy said it would do).

---

1. By subsequent amendment of KRS 435.-022 (c. 90, Acts of 1962) the crimes of voluntary and involuntary manslaughter were redefined and reclassified.

2. The company no longer contends it did not receive timely notice of Witte's death.

See, however, Trieger v. Commercial Travelers Mut. Acc. Ass'n, 122 Misc. 159, 202 N.Y.S. 410 (1923); Couch on Insurance (2d), § 49.14 (Vol. 13, p. 643).

Mrs. Witte testified that she first became aware of the policy in mid-January of 1959 when it was shown to her by Mr. Luedeke at his office, to which she had gone with Hon. William T. Hopkins, an attorney she had engaged to defend her in the criminal proceeding. She was also being represented in that connection by Hon. Malcolm Rhoads, one of Mr. Luedeke's partners. Though she learned on this occasion that she was named as the beneficiary, the policy was not turned over to her, and there is nothing in the transcript to suggest that she read it or was made aware of the proof of loss requirement. At this point we continue the narration with an excerpt from Mrs. Witte's testimony under cross-examination:

Q—"Was it retained by Mr. Luedeke?"

A—"It was."

Q—"In your behalf?"

A—"That's right."

Q—"He was representing you to make a claim?"

A—"He was representing the estate."

Q—"But this policy names you as the beneficiary. Did you consent for him to handle this policy on your behalf?"

A—"Not at that time."

Q—"You knew he had it?"

A—"He had it, as well as other insurance policies and papers."

Q—"Did he advise you he was making claim on this policy on your behalf?"

A—"Not at that time."

Q—"Was it your intention to leave it with him so that he might make a claim in your behalf?"

A—"I engaged Mr. Luedeke in April to attend to this affair."

Q—"In January, were you aware of this policy?"

A—"Yes."

Q—"And you left this policy with him to process on your behalf?"

A—"That's right."

Though counsel for the company treats this last answer as meaning Mrs. Witte left the policy with Mr. Luedeke "to process in her behalf" at the mid-January meeting, it seems clear to us that it refers back to her previous statement that she did so in April. The fair import of this and other testimony is that she was never represented by any attorney for any purpose other than her defense against the manslaughter charge until some time after the trial on April 21 and 22, 1959. Mr. Luedeke said it was late April or early May, and his office records show that Mrs. Witte signed a receipt for the policy on April 29, 1959.

During the time the Pinkerton detective was investigating the case he went to see Messrs. Luedeke and Rhoads in an effort to secure authorizations to see certain records, but Mr. Rhoads, who was representing her in the criminal case, would not permit it. So after Mrs. Witte employed Mr. Luedeke at the end of April following the criminal trial the first thing he did was to write the detective on May 11, 1959, enclosing signed copies of a consent form to see the records. This letter was forwarded to the insurance company, which returned the forms to Mr. Luedeke by a letter of May 25, 1959, advising him that the time for filing proof of loss had expired. There followed an exchange of correspondence in which by letters of May 27 and 29, 1959, the attorney submitted proof of loss and reminded the company that the detective had acquired the pertinent details of the case during his investigation; the company by letter of June 2, 1959, reiterated its position, returned the papers and said they were not properly filled out anyway; the attorney on July 3, 1959, resubmitted the papers; and on July 8, 1959, the company rejected them again. This suit followed.

It was stipulated in the trial court that the rights of the parties under this insur-

ance policy are governed by the law of New York. § 164, Subsection 3(A) (7) of the Insurance Law of New York, McKinney's Consol.Laws, c. 28, as enacted in 1951, required the 90-day proof of loss clause in accident and sickness insurance policies to include this further sentence:

"Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as is reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required."

Mrs. Witte contends that this sentence rather than the strict 90-day requirement applies.[3] The company says it does not, by virtue of a saving provision in the 1951 act (c. 630, Sec. 7, Acts of 1951) as follows:

"This act shall take effect July 1, 1951. A policy, rider or endorsement form, which could have been lawfully used or delivered or issued for delivery to any person in this State immediately before the effective date of this act may be used or delivered or issued for delivery to any such person during five years after the effective date of this act without being subject to the provisions of subsections two or three of section one hundred sixty-four."

It is not necessary, however, that we decide the question of whether Mrs. Witte's proof of loss was timely submitted, because it is our conclusion that under the circumstances of the case the requirement should be considered as having been waived by the company.

■ "The purpose of a provision for notice and proof of loss is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation, and to prevent fraud and imposition upon it." 29A Am.Jur. 490 (Insurance, § 1374); Couch on Insurance (2d), § 49.373 (Vol. 14, p. 15); O'Reilly v. Guardian Mutual Life Ins. Co., 60 N.Y. 169, 19 Am.Rep. 151 (1875).

■ Though it was physically possible for Mrs. Witte to submit proofs of loss before the criminal trial, no prudent insurance company would have approved and paid her claim without awaiting its outcome. Had it been determined that she killed her husband intentionally her claim as beneficiary of the policy would have been barred, and Witte's estate would have been entitled to the proceeds. The only importance to the company of having the facts at an early date was to make a timely investigation possible. This the company had done already, before Mrs. Witte knew even that the policy existed. That circumstance has no legal significance from the standpoint of the company's not being prejudiced by the delay, because it is settled that an insurer need not be prejudiced in order to rely on its contractual requirements as to notice and proof of loss. But it *is* significant, we think, from the standpoint of waiver. Though clause 6 of the standard provisions of the policy is so worded that the company's neglect or failure to furnish proof of loss forms to the beneficiary after receipt of a preliminary notice of accidental death would not in itself excuse the claimant from submitting some type of proof anyway, it is our view that the company's deliberate failure to send the necessary forms to Mrs. Witte, coupled with its promptly causing an independent investigation to be made on its behalf, did amount to an implied waiver of the requirement or, if not technically a waiver, an estoppel. Cf. Fidelity & Guar. Ins. Underwriters, Inc., v. Gregory, Ky., 387 S.W.2d 287 (1965). In fact, there appears to be some authority that an investigation alone, quite aside from a failure to

3. § 143 of the New York Insurance Law provides that if a policy is in violation of the statutory requirements it shall be enforceable as if it had conformed.

furnish proof of loss forms, may be sufficient to constitute a waiver. Couch on Insurance (2d), § 49,872 (Vol. 14, p. 305). Certainly after the company had fully advised itself of the circumstances of Witte's death there was no purpose whatever to be served by the filing of proofs of loss. Hence we concur in the trial court's conclusion that the claim is not defeated by Mrs. Witte's failure to submit timely proof of loss.

On the day of Witte's death he and Mrs. Witte were quarreling. He left the house and she tried to lock him out. He found the kitchen door unlocked, and they struggled as she sought to close the door which he was trying to enter. During this encounter he received a cut or stab wound in the thigh, from which he bled to death before sufficient aid to save his life could be procured.

The company contends that if Mrs. Witte committed manslaughter she cannot recover on the policy and that if she did not, then Witte was the aggressor, in which event his death was not accidental within the meaning of the policy. Cf. Prudential Life Ins. Co. v. Overby's Adm'x, 251 Ky. 750, 65 S.W.2d 1006 (1933).

Pursuant to stipulation the evidence in this proceding relating to the circumstances of the death was confined to a transcript of the testimony at the criminal trial. Mrs. Witte professed not to have seen the knife until after Witte said he was bleeding. Though she denied having it herself, she said that she did not see it in Witte's hand either. The jury in the criminal trial obviously decided that she had it but that the cutting resulted from carelessness and not an intent to kill. Under the same evidence it was not unreasonable for the chancellor to draw the same conclusion.

Metropolitan Life Ins. Co. v. McDavid, 39 F.Supp. 228 (E.D. Mich. 1941), the case on which the company relies as authority for the proposition that Mrs. Witte cannot recover if she committed manslaughter in the death of her husband, is not applicable, because it was a case of intentional manslaughter. Indeed, the opinion in that case (at 39 F.Supp. 232) expressly emphasized the distinction as follows:

"No cases have been found which hold that a person is barred from receiving the benefits * * * unless he killed and intended to kill the person from whom he was to receive the benefits. In other words, as far as the law has ever gone is to prevent the recovery of benefits which would not have become due and payable except for the intentional taking of the life of the benefactor.

"Now, in the same way, there are many decisions which hold that a beneficiary guilty of manslaughter is not barred from recovery in cases which are called manslaughter cases. These * * * are all cases in which there was no intent on the part of the killer to take the life of the benefactor."

We do not find any authority, nor has any been referred to our attention, suggesting that the policy of law forbidding one who had intentionally killed another to collect the insurance on his life applies to an unintentional homicide, even though it may have been unlawful by reason of negligence or gross negligence.

The judgment is affirmed.

MONTGOMERY, Judge (dissenting).

I cannot agree with the majority opinion. It is wrong because the New York law governs by policy provision and by agreement of counsel. The majority opinion does not cite any applicable New York case, while the rule upholding the ninety-day proof of loss requirement has been upheld in many cases.

In MacKay v. Metropolitan Life Insurance Company, 281 N.Y. 42, 22 N.E.2d 154, it was held that the proof of loss required by the policy provisions must be given within the ninety-day limit and therefore recovery should be refused. In Maryland Casualty Company v. Massey, 6 CCA, 38 F.2d 724, 71

A.L.R. 1428, proof of loss filed one day late was held to be too late and recovery was denied. Both of these cases were cited with approval in a 1965 case, Bland v. Trevvett, 23 A.D.2d 534, 256 N.Y.S.2d 644, in which the failure to comply with the ninety-day provision as to proof of loss was held to bar recovery. See also Whiteside v. North American Insurance Company, 200 N.Y. 320, 93 N.E. 948, 35 L.R.A.(N.S.) 696; Wachtel v. Equitable Life Assurance Society, 266 N.Y. 345, 194 N.E. 850; and Foulis v. Commercial Travelers Mutual Accident Association, 37 Misc.2d 743, 236 N.Y.S.2d 82.

The Bland v. Trevvett case involved the identical policy provision since the action was against Trevvett as treasurer of appellant. There, proof of loss was furnished five and one-half months late. The claimant sought to excuse her delay because of her "inability to secure a statement from a passenger in the automobile at the time of the accident who had been hospitalized by reason of serious injuries." She also urged that the insurer "was estopped to deny that the proof of loss was timely furnished for she had cooperated fully with an agent of appellant shortly after the accident and had given him full details and a copy of her attorney's file." Recovery was denied. It was held that the "reasonably possible" provision was not a part of the policy and did not apply, citing three of the cases above cited. The court said: "Neither the doctrine of estoppel nor the public policy of liberal construction can be invoked in support of respondent's position. The failure to comply with the policy and the statute controlling it require a dismissal of the complaint."

James Witte died November 13, 1958. Soon thereafter appellee was charged with and subsequently indicted for voluntary manslaughter by reason of Witte's death. Her brother-in-law engaged Harry Luedeke and Malcolm Rhoads, partners in the same law firm, to represent the estate and appellee, respectively. On December 12, 1958, Luedeke gave appellant notification of Wit-

te's death. In the letter he used the pronoun "We," referring to his firm, including Rhoads. On December 17, 1958, his firm received proofs of loss. Luedeke testified that he advised appellee in December 1958 that the firm had the policy and that she was the beneficiary. He also said that his firm was not asked by appellee to collect on the policy until April or May 1959. Willaim Sorgs testified that Luedeke told him in December 1958 that he represented appellee. Appellee admitted that she became aware of the policy and that she was the named beneficiary at a meeting on January 15, 1959, with Luedeke, Rhoads, and another attorney named Hopkins, who had been employed to assist in representing her on the criminal charge.

Inasmuch as evidence that she was the beneficiary of a $10,000 insurance policy on the life of the man whom she was charged with killing would have been evidence of a motive and would have been condemning, it is fair to assume that the insurance policy and its beneficiary provision were thoroughly discussed at this meeting.

The further significance of this is that there was a serious question whether appellee could have collected as beneficiary under the policy if she had been convicted of the felony. Soon after the trial was over on April 22, 1959, and appellee had been freed of the felony charge, the proof of loss was processed at her direction by Luedeke and filed with appellant. This accounts for the delay for which appellant should not be charged and which is not justified under the New York law. Bland v. Trevvett, 23 A.D.2d 534, 256 N.Y.S.2d 644; Allstate Insurance Company v. Manger, 30 Misc.2d 326, 213 N.Y.S.2d 901.

The majority opinion seeks to justify in part its holding of waiver of the filing of proof of loss with appellant by indicating that the insurance company made its own investigation by means of a private detective and thus rendered the filing of such proof of loss unnecessary. Such a position is absurd on its face to suggest that an in-

surance company waives the right to have a claimant submit a proof of loss because of the insurer's investigation of the claim.

For these reasons I think that the appellant should win because of appellee's failure to file proof of loss within ninety days of the death of James Witte, because appellee was fully cognizant of her rights as beneficiary under the policy by reason of notice and advice of her own counsel well within the ninety-day period, and because appellant did not waive its right to the proof of loss, all of which should bar recovery by her.

HILL, J., joins in dissent.